FILED
United States Court of Appeals
Tenth Circuit

December 10, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THE BURLINGTON NORTHERN
AND SANTA FE RAILWAY
COMPANY,

        Applicant-Appellant,

    v.

PUBLIC SERVICE COMPANY OF
OKLAHOMA,

        Respondent-Appellee.

No. 09-5133

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. CV-05-53-TCK-FHM)**

---

Harry L. DeLung, Jr., Freeborn & Peters LLP, Chicago, Illinois (Paul A. Duffy, Freeborn & Peters LLP, Chicago, Illinois, and William P. Tunnell, Jr., Rainey Law Firm, Oklahoma City, Oklahoma, with him on the briefs, and Michael A. Smith, Freeborn & Peters LLP, Chicago, Illinois, with him on the Reply Brief only) for Applicant-Appellant.

John H. LeSeur, Slover & Loftus LLP, Washington, District of Columbia (Frank J. Pergolizzi, Slover & Loftus LLP, Washington, District of Columbia, and Lewis N. Carter, Doerner Saunders Daniel & Anderson, L.L.P., Tulsa, Oklahoma, with him on the brief) for Respondent-Appellee.

---

Before **BRISCOE**, Chief Judge, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

This appeal arises from an 18-year rail pricing dispute between the Burlington Northern and Santa Fe Railway Company (BNSF) and the Public Service Company of Oklahoma (PSO). The question we must consider is whether the district court erred in confirming an arbitration board's decision despite BNSF's claims that the board misconstrued the parties' agreement and exceeded its authority by deciding a non-arbitrable issue.

We **AFFIRM**. The arbitration clause in the agreement was enforceable and the district court did not err in deferring to the board's determinations regarding the scope of its authority and the proper construction of the agreement. We conclude moreover that PSO is entitled to attorney fees under Oklahoma law since it has prevailed in a civil action to recover payment for services rendered.

## I. Background

### A. The 1985 Agreement

In 1985, BNSF and PSO entered into a long-term agreement to transport coal to a PSO generating station. Because the station was served exclusively by a third-party's rail line at that time, BNSF initially was to provide "joint-line" service, using its own lines and the third-party's. The agreement called for PSO to construct a new rail line connecting the station to a BNSF line. Once this line was completed, BNSF would begin providing single-line service (which the contract termed "Single Line Direct Service").

The agreement had a number of provisions relevant to our discussion. The prices PSO initially agreed to pay for single-line service consisted of a "Base Rate" of $14.00 per ton that was subject to annual, fixed-percentage adjustments. The Base Rate, as adjusted by §§ 4.1 and 4.2 of the agreement, produced "Effective Rates," which were the rates PSO would pay for single-line service. R. Doc. 6 at 60.

Section 4.2 contained what the parties colloquially called a rate floor provision. It stated, "[e]xcept as provided in Section 11, the Effective Rate for Single Line Direct Service by [BNSF] will not be less than the Base Rate in effect on the date this Agreement is filed with the ICC." *Id.* at 76. Section 11 granted either party the right to request renegotiation of the Effective Rate or renegotiation of the adjustment method. *Id.* at 105.

Section 13 specified certain disputes would be submitted to an arbitration board, including "renegotiation of the rate or escalation (Section 11)." *Id.* at 112–14. Section 13 also provided, "[t]he arbitration board shall have the authority to amend the rate or adjustment method if necessary to reflect the intentions of the parties as set out in this Section." *Id.* at 105. Disputes regarding other matters would be resolved in any state or federal court in Oklahoma.

**B. The 1994 Arbitration Award**

In 1992, PSO instituted § 11 price negotiations. Because the parties could not come to an agreement, PSO invoked the § 13 arbitration procedures. The matter was then arbitrated by a three-member arbitration board in 1994.

The meaning of the rate floor provision in § 4.2 was uncontested during the 1994 arbitration. Both parties agreed that, prior to a Section 11 renegotiation, the Effective Rate could not be adjusted to rates less than the $14.00-per-ton Base Rate "except as provided in Section 11." *Id.* at 614. The parties also agreed the arbitration board could set renegotiated Effective Rates below $14.00 per ton.

The arbitration board issued a decision in favor of PSO. It directed, "the Agreement rates as of July 1, 1994, should and shall be $11.77 per ton for single-line service." R. Doc. 2 at 23. It also replaced the rate adjustment procedures with a new procedure that adjusted the new Effective Rates up or down based on changes in railroad costs, as measured by rail indices published by the Interstate Commerce Commission. The 1994 arbitration award did not mention a rate floor. But the board retained "jurisdiction to resolve any dispute that may arise between the parties over implementation of this Decision and Award." *Id.* at 24.

The same day the board entered its 1994 award, BNSF filed a motion to vacate in Texas state court. PSO removed the state action to federal court, which then transferred the action to the Northern District of Oklahoma. After the district court confirmed the arbitration award, BNSF appealed to this court,

-4-

contending the district court lacked jurisdiction and one of the arbitrators was biased. We rejected these contentions and affirmed. *Pub. Serv. Co. of Okla. v. Burlington N. R.R. Co.*, No. 95-5017, 1995 WL 640375 (10th Cir. Oct. 20, 1995).

## C. The Fourth Agreement Amendment (1995)

After the initial round of litigation, PSO and BNSF entered into an amendment to the agreement.[1] The parties agreed, "as of October 1, 1995, the Effective Rate for Single Line Direct Service via [BNSF] . . . is $12.01 per net ton." R. Doc. 6 at 153. The amount of $12.01 was reached by applying the board-prescribed adjustment procedures to the board-prescribed rate of $11.77. The parties also amended the rate adjustment procedure in § 4.2 so the Effective Rates would move "upward or downward" by the board-prescribed rate adjustment procedure. *Id.* at 154.

During the negotiations of this amendment, PSO suggested the parties remove the rate floor provision in § 4.2 because the arbitration board had set new Effective Rates below $14.00 per ton. BNSF disagreed and insisted the provision remain in the agreement. In the end, the parties kept the provision in the agreement but agreed to disagree as to its meaning and effect.

---

[1] The parties refer to this as the "Fourth Amendment." The prior three amendments are not material to this appeal.

**D.  The Parties' Rate Floor Dispute**

In 1996, the rate adjustment procedure prescribed by the board and set forth in the amended agreement produced an Effective Rate of $11.67 per ton for single-line service.  BNSF invoiced PSO at a rate of $11.77 per ton, arguing this was the new "rate floor" under the agreement.  PSO disagreed and paid BNSF the adjusted Effective Rate of $11.67 per ton.  PSO contended there was no rate floor after the 1994 award and both the 1994 award and the amended agreement require the use of the adjusted Effective Rate.

The parties' rate dispute came to a head in 2001, when PSO exercised its right to "buy out" the last year of the agreement term (2002).  As provided in § 16.2, the buy-out payment was calculated in reference to the Effective Rate at the date of termination.  PSO calculated the buy-out payment using the fourth quarter 2001 adjusted Effective Rate of $11.30 per ton.  BNSF claimed the payment should have been calculated using a rate of $11.77 per ton.

**E.  The Parties' Agreement to Arbitrate the Rate Floor Dispute**

After several years of wrangling, in 2005 the parties entered into a submission agreement concerning the terms under which they would arbitrate BNSF's rate floor claim.  In a joint motion to the district court for the Northern District of Oklahoma, they asked the court to issue an order with the following directions:

(a) The arbitration board shall adjudicate BNSF's claim that, pursuant to the [1994 award] and the [1985 agreement], the amount of the rate for BNSF single-line service, as provided for in the Award, cannot be less than $11.77 per ton ("BNSF Claim").

(b) The arbitration board, in adjudicating BNSF's Claim, shall address all of PSO's defenses to BNSF's Claim, including PSO's defense that BNSF's claim is time-barred, and all of BNSF's responses to such defenses.

(c) The board shall not consider any claims by BNSF and PSO other than the BNSF Claim referenced in (a) above.

Supplemental R. Doc. 3 at 41. The district court adopted this exact language in its subsequent order, and the parties proceeded to arbitration.

## F.  The 2006 Arbitration Award

In 2006, the arbitration board issued its final merits decision. It agreed with PSO and held that neither the 1994 award nor the amended agreement set a rate floor of $11.77 per ton. Specifically, the board determined that the rate floor provision in § 4.2 existed only until the agreement was renegotiated under § 11. Because it concluded the 1994 award produced "precisely the type of result" that the renegotiation and arbitration procedures contemplated, the board denied BNSF's request to modify the 1994 award to include a rate floor. R. Doc. 16 at 614–15.

One arbitrator dissented from the board's decision, arguing the issue before the board "is how to interpret the rate floor provision of the Agreement" and the board should have exercised its authority to "reset the rate floor at $11.77." *Id.* at

620–21. The board majority rejected this position, among other things, as "contrary to the plain language of the 1985 agreement and 1994 award." *Id.* at 615.

## G. Post-Award Proceedings in the District Court

PSO filed a motion to confirm the 2006 award in the district court, which granted the motion and entered judgment for PSO. Later, at BNSF's request, the court vacated its judgment in order to consider BNSF's claims that (1) the board exceeded its power in determining the 1994 award and the amended agreement contained no rate floor of $11.77 per ton, and (2) the board incorrectly interpreted unambiguous agreement language.

On August 19, 2009, the district court denied BNSF's motion to vacate and once again granted PSO's motion to confirm. *Burlington N. R.R. Co. v. Pub. Serv. Co. of Okla.*, No. 05-CV-53-TCK-FHM, 2009 WL 2588868 (N.D. Okla. Aug. 19, 2009). With regard to BNSF's first claim, the court determined the board's finding was directly related to "renegotiation of the rate or escalation" in § 11 (the renegotiation section) as outlined in § 13 (the arbitration section). *Id.* at *4. The court also noted that, since BNSF submitted the precise issue for arbitration, it "cannot escape an unfavorable decision by claiming after the fact that the Board was without authority to hear the dispute." *Id.* at *5. With regard to BNSF's claim that the board erroneously interpreted the agreement, the court found the contention to be "without merit." *Id.*

-8-

## II. Discussion

### A. Arbitrability and the Scope of an Arbitrator's Authority

#### 1. *Standard of Review*

In reviewing the confirmation of an arbitration award, we review the district court's factual findings for clear error and its legal determinations de novo. *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001). We are required nevertheless to "give extreme deference to the determination of the [arbitrator]." *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th Cir. 2000). "Once an arbitration award is entered, the finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances." *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1146–47 (10th Cir. 1982). An arbitration award will only be vacated for the reasons enumerated in the Federal Arbitration Act, 9 U.S.C. § 10, or for "a handful of judicially created reasons." *Sheldon*, 269 F.3d at 1206 (observing that a district court may set aside an arbitration award based on a violation of public policy, manifest disregard of the law, or denial of a fundamentally fair hearing).

As an initial matter, we must clarify the distinction between arbitrability and the scope of an arbitrator's authority, because different standards of review apply to each. An issue is arbitrable if it is subject to decision by arbitration or referable to an arbitrator or arbiter. WEBSTER'S THIRD NEW INT'L DICTIONARY, UNABRIDGED 110 (2002). Here, the arbitrable issue is whether the rate for single-

line service can fall below $11.77 per ton.  In contrast, the scope of authority question is whether the board, in determining whether the rate can fall below $11.77 per ton, had the authority to declare no rate floor provision existed.

So long as the parties have not specifically agreed to submit the arbitrability[2] question itself to arbitration (i.e., to arbitrate arbitrability), a court will decide independently whether the merits of the parties' dispute is arbitrable. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 943 (1995).  Thus, "a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute."  *Id.* at 942.

But once a court independently determines the parties agreed to arbitrate an issue, it should give "extreme deference" to an arbitrator's decision regarding the scope of that issue.  *See Sheldon*, 269 F.3d at 1206.  Other circuits have expressly held "the arbitrator's interpretation of the scope of his powers is entitled to the same level of deference as his determination on the merits."  *See Schoenduve Corp. v. Lucent Techs., Inc.*, 442 F.3d 727, 733 (9th Cir. 2006); *Major League Umpires Ass'n v. Am. League of Prof. Baseball Clubs*, 357 F.3d 272, 279 (3d Cir. 2004).

---

[2] Courts commonly use "arbitrability" to refer to the quality or state of being arbitrable.  *See, e.g., Texoma Natural Gas Co. v. Oil Workers Int'l Union*, 58 F. Supp. 132, 148 (D. Tex. 1943).  However, arbitrability is not defined in *Black's Law Dictionary*, the *Oxford English Dictionary*, or *Webster's Third New International Dictionary, Unabridged*, even though the word arbitrable can be traced back nearly five hundred years. *See* OXFORD ENGLISH DICTIONARY at 601–02 (2d ed. 1989).

BNSF attempts to garner a more favorable standard of review by masquerading its scope of authority claim as an arbitrability claim. It contends it did not submit the rate floor provision to arbitration and hence it is entitled to the district court's independent review of its claims. The problem for BNSF is that the parties entered into a submission agreement in which they jointly agreed to arbitrate their dispute—specifically, (1) BNSF's claim that the rate for single-line service cannot be less than $11.77 per ton (i.e., the purported rate floor), and (2) PSO's defenses to BNSF's claim, including the defense that no post-1994 rate floor existed. Accordingly, the district court correctly applied a deferential standard of review to the board's merits determinations after independently concluding BNSF agreed to arbitrate "the precise issue that it now contends is outside the Board's scope of authority." *Burlington*, 2009 WL 2588868 at *5.

BNSF asks us to review de novo whether the board properly construed the submission agreement to permit it to rule in PSO's favor. But the board's determination that it had the authority to declare no rate floor provision existed is entitled to the same "extreme deference" as its determinations on the merits. *See Sheldon*, 269 F.3d at 1206; *Schoenduve Corp.*, 442 F.3d at 733. BNSF cannot escape this deference by characterizing its challenge to the board's scope of authority as an arbitrability issue. The finality of any arbitration award would be meaningless if a losing party could re-litigate its dispute in court by claiming an

arbitrator exceeded his or her authority. *See Dominion Video Satellite, Inc. v. Echostar Satellite LLC*, 430 F.3d 1269, 1279 (10th Cir. 2005).

BNSF presents two additional arguments to gain an independent review of its claims. First, it contends a less deferential standard of review applies to claims that arbitrators exceeded their powers than applies to claims of fraud, corruption, or misconduct. *See* Aplt. Br. at 26–27 ("A court reviewing an arbitrator's decision under FAA 9 U.S.C. § 10(a)(4) does not apply the same deference as required for challenges arising under FAA 9 U.S.C. § 10(a)(1) through 10(a)(3)."). We have held, however, that "our highly deferential standard of review" applies to claims "the arbitrator exceeded his power in issuing the award." *DMA Int'l, Inc. v. Qwest Comm. Int'l, Inc.*, 585 F.3d 1341, 1345 (10th Cir. 2009).

Second, BNSF points to *United Paperworks Int'l Union v. Misco, Inc.*, a Supreme Court decision, for the proposition that a high level of deference applies only when the arbitrator is acting within the scope of his or her authority. 484 U.S. 29 (1978). This reliance is misguided. In fact, *United Paperworks* holds, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." 484 U.S. at 38. Thus, *United Paperworks* mandates a deferential standard of review on scope of authority claims.

-12-

In sum, BNSF cannot obtain an independent review of its scope of authority claim by characterizing it as an arbitrability claim. An arbitrability issue does not arise whenever the losing party to an arbitration avers the arbitrator exceeded his or her authority. After the district court independently concluded the parties' rate dispute was arbitrable, it correctly applied a deferential standard of review to the board's determination of the scope of its authority.

*2. Scope of Authority*

To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, we follow the three-part inquiry enunciated in *Cummings v. FedEx*:

> First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

404 F.3d 1258, 1261 (10th Cir. 2005) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (emphasis, internal citations, and quotations omitted).

As an initial matter, we reiterate our finding that BNSF expressly agreed to allow the arbitration board to consider the rate floor issue. Even if it had not, our case law provides no support for BNSF's argument. BNSF first contends the arbitrator board exceeded the scope of its authority because a determination that the rate floor was temporal (i.e., not intended to apply after a § 11 renegotiation) and therefore is a collateral matter beyond the purview of the agreement's narrow arbitration clause. Aplt. Br. at 33. To support this argument, BNSF cites two cases—*Cummings* and *Chelsea Family Pharmacy, PLLC v. Medco Health Solutions, Inc.*, 567 F.3d 1191, 1196 (10th Cir. 2009). Both these cases can be distinguished easily on the facts.

In *Cummings*, the arbitration provision was limited to disputes regarding the termination of operating agreements (essentially, employment contracts) between FedEx and package delivery contractors. 404 F.3d at 1260. But FedEx sought to compel arbitration on claims of breach of implied contract and breach of the implied duty of good faith and fair dealing arising out of an implied contract. *Id.* at 1262. Because the plaintiffs did not actually or constructively terminate the operating agreements, which according to the unambiguous provision are the only disputes subject to arbitration, we held that these claims were collateral matters. *Id.*

Similarly, this court in *Chelsea* held a claim of unfair business practices was collateral to an arbitration clause that was limited to disputes "arising out of

-14-

or relating to payments to [Chelsea] by Medco" (and not the other way around). 567 F.3d at 1194. In contrast, we held Chelsea's first claim, alleging inadequate reimbursement, related to payment and thus must be arbitrated. *Id.* We reiterated, "If the allegations underlying the claims touch matters covered by the parties' [arbitration agreement], then those claims must be arbitrated, whatever the legal labels attached to them." *Id*. at 1198 (quotations omitted).

Both *Cummings* and *Chelsea* involved matters distant to the narrow scope of the relevant arbitration provisions. In contrast, the question of whether the 1994 award and the amended agreement contain a rate floor of $11.77 per ton squarely touches on the submitted issue of the 2006 arbitration—namely, BNSF's claim it was entitled to payments on the basis of a rate floor.[3] It is also directly related to "renegotiations of the rate or escalation" in § 11 (governing renegotiation), as outlined in § 13.1 (governing arbitration) of the agreement, since "[i]t was the parties' renegotiation of the Effective Rate that led to the dispute over whether a rate floor remained inherent in the Agreement." *Burlington*, 2009 WL 2588868 at *4.

---

[3] In its reply brief, BNSF concedes it "asked the Board to exercise its retained jurisdiction and clarify the 1994 Award did not delete the rate floor." Aplt. Reply Br. at 2. Nonetheless, BNSF now contends "a ruling on [the] existence of the rate floor provision was never within the Board's jurisdiction, either in 1994 or 2006." *Id*. at 4. As these quotes demonstrate, BNSF muddles the distinction between the merits of its claim and the scope of the arbitration.

In sum, the board's determination regarding the existence of a base floor is within the purview of the agreement's arbitration clause and falls squarely within the issues presented to the board by the parties' joint submission agreement. As a result, the district court did not err in concluding the board did not exceed the scope of its authority.

## B. The Construction of the Agreement

Absent circumstances not present here, we will not open to review an arbitration award on the merits, including the interpretation of a contract. *Sterling Colo. Beef Co. v. United Food & Commercial Local Union No. 7*, 767 F.2d 718, 720 (10th Cir. 1985). After all, "[i]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enter. Wheel and Car Corp.*, 363 U.S. 593, 599 (1960); *accord Brown*, 220 F.3d at 1183 ("[The parties] contracted for the arbitrator's construction of the contract not a judge's construction."). Hence, we "will not interfere with an arbitrator's decision unless it can be said with positive assurance that the contract is not susceptible to the arbitrator's interpretation." *Sterling*, 767 F.2d at 720.

The agreement in this case is easily susceptible to the board's interpretation. If anything, it is BNSF's reading that is inconsonant with the plain meaning of the contract. BNSF contends the rate floor provision simply means

-16-

the adjusted rate can never fall below an independently-determined Base Rate. It also contends the 1994 arbitration award reset the Base Rate amount to $11.77 per ton and fine-tuned the rate adjustment procedures. If all this were true, then BNSF could aver the rate floor provision is entirely separate from the Base Rate and the rate of escalation, and hence is outside the scope of an arbitration.

But this argument mischaracterizes both the rate floor provision and the 1994 award. Even when reviewed independently, the rate floor provision does not survive the 1994 award for (at least) two reasons. First, by including the limitation "except as provided in Section 11," the rate floor provision is expressly bound by renegotiations of the rate and the adjustment method. Second, the rate floor provision refers not to an adjustable Base Rate but to a specific Base Rate amount—$14.00 per ton, the rate in effect when the agreement was filed with the ICC in 1985. So the rate floor provision's plain language prevents the conclusion that it can be retained by inferring a new Base Rate amount.

In addition, BNSF misstates what the 1994 arbitration accomplished. The board did not mention a "Base Rate" in either the "findings and conclusions" that preceded the award or the award itself. Instead, the board mandated a new, adjustable "Agreement rate." In other words, no post-1994 Base Rate exists to serve as a rate floor. Both concepts were replaced entirely by a new calculation scheme. Thus, BNSF cannot aver the rate floor provision is an independent, non-

arbitrable issue.  In light of the weaknesses of BNSF's proposed reading of the agreement, the district court correctly deferred to the board's construction.

## C.  Attorney Fees

"In diversity cases generally, and certainly in this circuit, attorney fees are determined by state law and are substantive for diversity purposes."  *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1445 (10th Cir. 1993).  Because the district court's jurisdiction was based on diversity jurisdiction, Oklahoma law on attorney fees governs.  *See DCR Fund I, LLC v. TS Family Ltd. P'ship*, 261 F. App'x 139, 147 (10th Cir. 2008) (affirming attorney fees where the district court had diversity jurisdiction over a contract dispute).

Section 936 of Oklahoma's civil procedure statute permits "the prevailing party" in certain types of cases to receive "a reasonable attorney fee to be set by the court," but not when "otherwise provided by law or the contract which is the subject of the action."  OKLA. STAT. ANN. tit. 12 § 936 (West 2002).  PSO is the prevailing party in this case, and its claim for attorney fees falls under the statute because BNSF's claim was for an alleged failure to pay fully for services rendered.  *See Natkin & Co. v. Midwesco, Inc.*, 863 P.2d 1222, 1225 (Okla. 1993).  So PSO is entitled to attorney fees under § 936.

BNSF argues § 936 applies only "unless otherwise provided by . . . the contract which is the subject of the action," yet the agreement's arbitration section specifies that each party "shall pay all costs of its . . . legal counsel."  *See*

R. Doc. 6 at 113.  But the Oklahoma Supreme Court in *Natkin* affirmed an award

of attorney fees arising from post-arbitral court costs despite an arbitration clause

requiring each party to pay its own attorney fees.  *Natkin*, 863 P.2d at 1225.  The

court held the clause—absent evidence to the contrary—was intended to apply

only to arbitration costs, not costs incurred pursuant to confirming the award in

court.  *Id.*

> The same is true here.  Section 13.3 of the parties' agreement specifies,

> Each party shall pay the expense of the arbitrator selected by or for
> it, and all other costs of the arbitration shall be equally divided
> between the parties hereto.  Each party shall pay all costs of its
> employees, witnesses, and legal counsel.

R. Doc. 6 at 62.  Thus, the provision limits the assignment of legal counsel

expenses to "costs of the arbitration."  *Id.*  As in *Natkin*, the attorney fees sought

by PSO are not costs of the arbitration but the post-arbitral expense of defending

the board's final decision in court.  *See Natkin*, 863 P.2d at 1225.

BNSF does not argue that the scope of attorney fees is arbitrable, nor could

it.  Section 13.4 of the agreement requires any question or controversy not

specified in § 13.1 to be adjudicated in federal or state court.  Post-arbitral

expenses of defending an arbitration award do not fall under § 13.1 because they

do not relate to the appropriateness of substitute indices, the renegotiation of the

rate or escalation, or the added cost or liability of transporting beneficiated coal.

While the agreement could have made arbitrable all aspects of the arbitration procedures, it has not done so.

Accordingly, the parties' agreement does not prevent PSO from receiving attorney fees under Oklahoma law.[4]

### III. Conclusion

Because the district court applied the correct standard of review to BNSF's claims and correctly deferred to the board's determinations regarding the scope of its authority and the construction of the agreement, we **AFFIRM** the confirmation of the arbitration award. We **GRANT** PSO's request for attorney fees under OKLA. STAT. ANN. tit. 12 § 936 but **DENY** its request for sanctions under 18 U.S.C. § 1927 and damages under Rule 38 of the Federal Rules of Appellate Procedure. Finally, we **GRANT** PSO's motion to strike because BNSF does not dispute its appendix included documents that were not in the record before the district court.

---

[4] Applying the same reasoning, a magistrate judge has recommended that PSO's motion for attorney fees in the district court be granted under OKLA. STAT. ANN. tit. 12 § 936. Report and Recommendation at 2–6, *Burlington N. R.R. Co. v. Pub. Serv. Co. of Okla.*, No. 05-CV-53-53-TCK-FHM (N.D. Okla. Nov. 3, 2010).