FILED
United States Court of Appeals
Tenth Circuit

April 14, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENName CIRCUIT

---

MID ATLANTIC CAPITAL
CORPORATION,

  Petitioner Cross Defendant -
Appellant / Cross-Appellee,

v.

BEVERLY BIEN; DAVID H.
WELLMAN,

  Respondents Cross Claimants -
Appellees / Cross-Appellants.

Nos. 18-1195 and 18-1200

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:17-CV-00122-RPM)**

---

Andrew Stanton, Jones Day, Pittsburgh, Pennsylvania, (Derek C. Anderson, Winget, Spadafora & Schwartzberg, LLP, Boulder, Colorado, with him on the briefs), for Appellant / Cross-Appellee.

Richard Fosher, Oakes & Fosher, LLC, St. Louis, Missouri, for Appellees / Cross-Appellants.

---

Before **BRISCOE**, **HOLMES**, and **McHUGH**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

A married couple, Ms. Beverly Bien and Mr. David Wellman, invested money with Mid Atlantic Capital Corporation ("Mid Atlantic"). Their investments performed poorly. Stung by the losses, Ms. Bien and Mr. Wellman initiated arbitration proceedings against Mid Atlantic. The arbitration panel awarded Ms. Bien and Mr. Wellman damages, attorney's fees, and arbitration costs. The panel also ordered Ms. Bien and Mr. Wellman to reassign their ownership interests in their investments to Mid Atlantic.

Mid Atlantic moved the federal district court to modify the arbitration award to correct "an evident material miscalculation of figures." 9 U.S.C. § 11(a). The district court denied the motion because the alleged error that Mid Atlantic sought to remedy did not appear on the face of the arbitration award. In the amended final judgment, in addition to ordering Mid Atlantic to pay Ms. Bien and Mr. Wellman certain damages, the court ordered that prejudgment interest would accrue on the damages portion of the award and that postjudgment interest would accrue at the federal rate specified in 28 U.S.C. § 1961. Lastly, the court ordered Ms. Bien and Mr. Wellman to reassign to Mid Atlantic their ownership interests in their investments, including any distributions that they had received since the arbitration award due to the investments.

Both parties appeal from the district court's order. Mid Atlantic specifically challenges the court's denial of its motion to modify the arbitration

2

award.  Ms. Bien and Mr. Wellman cross-appeal, challenging the court's rulings applying prejudgment interest to only the damages portion of the award and ordering them to reassign any distributions that they had received since the arbitration award due to their ownership interests in the investments.  Exercising jurisdiction under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(D) and (a)(3), we **affirm** the district court's judgment in all respects.

## I

Mid Atlantic is a brokerage firm registered with the Financial Industry Regulatory Authority ("FINRA").[1]  Ms. Bien and Mr. Wellman opened several brokerage accounts with Mid Atlantic.  Through those accounts, Ms. Bien and Mr. Wellman invested in two investment vehicles, Sonoma Ridge Partners and KBS REIT [i.e., real estate investment trusts] ("KBS").  Ms. Bien and Mr. Wellman's contracts with Mid Atlantic each included an identically worded arbitration

---

[1]  FINRA is "a quasi-governmental agency responsible for overseeing the securities brokerage industry."  *ACAP Fin., Inc. v. S.E.C.*, 783 F.3d 763, 765 (10th Cir. 2015).  "FINRA is the successor to the National Association of Securities Dealers ('NASD')" and was formed in 2007 when NASD "consolidated with the regulatory arm of the New York Stock Exchange."  *Fiero v. Fin. Indus. Regulatory Auth., Inc.*, 660 F.3d 569, 571 & n.1 (2d Cir. 2011); *see Cory v. Allstate Ins.*, 583 F.3d 1240, 1242 n.1 (10th Cir. 2009) (explaining that NASD "changed its name" to FINRA in 2007).  Some documents in the appellate record reference NASD instead of FINRA.  For our purposes, the distinction between NASD and FINRA is one without a difference.  *See, e.g.*, *Birkelbach v. S.E.C.*, 751 F.3d 472, 475 n.1 (7th Cir. 2014) ("[T]here is no meaningful distinction between the entities [FINRA and NASD]. . . .").  We thus read all record references to NASD as referring to FINRA.

3

clause. That clause obligated the parties to resolve all disputes through binding arbitration conducted according to FINRA rules. *See, e.g.*, Aplt.'s App., Vol. III, at 715 (Brokerage Account Appl. of Ms. Bien, executed Feb. 12, 2007) ("All controversies that may arise between you, [and] us . . . including, but not limited to, controversies concerning . . . breach of this or any other agreement between you and us . . . shall be determined by arbitration").

## A

After their investments in Sonoma Ridge Partners and KBS suffered heavy losses, Ms. Bien and Mr. Wellman initiated arbitration proceedings against Mid Atlantic. They alleged that Mid Atlantic had, among other things, sold them unreasonably risky investments. To remedy the resulting harm, Ms. Bien and Mr. Wellman sought damages, as well as attorney's fees, costs, and interest.

The arbitration panel held a hearing. At the hearing, Ms. Bien and Mr. Wellman's expert offered the panel two ways to calculate the losses at issue. The first option looked to Ms. Bien and Mr. Wellman's "net out-of-pocket" losses. Aplt.'s App., Vol. II, at 244 (Arbitration Hr'g Tr., dated Nov. 3, 2016). The expert calculated Ms. Bien and Mr. Wellman's net out-of-pocket losses as $292,411. The second measure of damages looked to Ms. Bien and Mr. Wellman's "market-adjusted damages." *Id.* at 250. The measure of those damages is "the difference between the actual return on these investments and

4

what the return would have been if [Ms. Bien and Mr. Wellman's] money had been invested in a well-managed 'benchmark' account." *Id.*, Vol. V, at 1079 (Order, entered Mar. 23, 2018); *see also id.*, Vol. II, at 251 (the expert observing that "market-adjusted damages" is "[t]he difference" between what Ms. Bien and Mr. Wellman would have received if they "had been invested in a diversified portfolio" and what they actually received by "investing" in the riskier investments at issue). The expert calculated Ms. Bien and Mr. Wellman's market-adjusted damages as between $484,684 and $618,049. Mid Atlantic did not present any expert testimony on damages.

During the hearing's closing arguments, Ms. Bien and Mr. Wellman read into the record a written final prayer for relief. In it, they requested only market-adjusted damages. Indeed, they asserted that compensating them for their net out-of-pocket losses would be "inconsistent with the case law" and would not make them whole. *Id.*, Vol. II, at 434 n.1 (Final Prayer for Relief, dated Mar. 13, 2017). And so Ms. Bien and Mr. Wellman prayed for market-adjusted damages. Together, they also requested $118,560 in attorney's fees, $26,812.82 in costs, interest on the damages at 8% per year, and punitive damages.

The arbitration panel ruled in substantial part in favor of Ms. Bien and Mr. Wellman. It ordered Mid Atlantic to pay them two forms of damages: (1) initial-

5

investment-loss damages and (2) compensatory damages. The panel's damages award looked like this:

| Damages Award | Ms. Bien | Mr. Wellman | Both | Total |
|---|---|---|---|---|
| **Initial Investment Loss** | $240,321 | N/A | $52,090 | $292,411 |
| **Compensatory Damages** | $437,286 | $47,397 | N/A | $484,683 |
| **Total** | $677,607 | $47,397 | $52,090 | $777,094 |

In addition, the arbitration panel ordered Mid Atlantic to pay interest at 8% per year on each form of damages. That interest would accrue from the date Ms. Bien and Mr. Wellman initiated arbitration proceedings until the damages were "paid in full." *Id.*, Vol. I, at 28 (Arbitration Award, dated Dec. 12, 2016). The award also called for Mid Atlantic to pay $118,560 in attorney's fees, $26,812.82 in costs, and all arbitration fees. The panel declined, however, to award any other remedies, such as punitive damages. And it did order Ms. Bien and Mr. Wellman to "reassign ownership of all Sonoma Ridge Partners and KBS REIT investments to [Mid Atlantic]." *Id.*

**B**

Mid Atlantic moved the district court to modify the arbitration award.[2] It argued, among other things, that the arbitration panel had given Ms. Bien and Mr. Wellman a double recovery. According to Mid Atlantic, the panel's $292,411

---

[2] Mid Atlantic's motion also asked the district court to vacate the award. The court denied this request, which is not at issue on appeal.

6

award in initial-investment-loss damages corresponded with Ms. Bien and Mr. Wellman's expert's testimony that their net out-of-pocket losses were $292,411. And the panel's $484,683 award in compensatory damages almost exactly matched the $484,684 in market-adjusted damages that the expert had at one point said Ms. Bien and Mr. Wellman incurred. Yet, that expert had presented net out-of-pocket damages and market-adjusted damages as *alternative* measures of their losses, and Ms. Bien and Mr. Wellman had asked for only market-adjusted damages in their final prayer for relief. Thus, by effectively awarding Ms. Bien and Mr. Wellman *both* net out-of-pocket damages and market-adjusted damages, the panel allegedly gave them a double recovery. To correct this purported double recovery, Mid Atlantic asked the district court to modify the arbitration award.

In response, Ms. Bien and Mr. Wellman moved the district court to confirm the award. As they saw it, the district court could modify the arbitration award to correct the alleged double recovery only if there was "an evident material miscalculation of figures" on the face of the award. *Id.*, Vol. III, at 517 (Br. in Supp. of Mot. to Confirm Award) (quoting 9 U.S.C. § 11(a)). And the alleged double recovery here appeared only when one delved into the arbitration record. Thus, they argued that the district court lacked authority to modify the award.

7

The district court sided with Ms. Bien and Mr. Wellman. Like Mid Atlantic, the court thought the arbitration award was "disturbing." *Id.*, Vol. V, at 1084. It agreed that "what the panel called 'initial investment loss[es]'" and "compensatory damages" corresponded with what Ms. Bien and Mr. Wellman had called, respectively, "net out-of-pocket losses" and "market-adjusted damages." *Id.* So the court found that by awarding "both net out-of-pocket losses . . . and market-adjusted damages," the panel effectively gave Ms. Bien and Mr. Wellman a double recovery. *Id.* But the district court read 9 U.S.C. § 11(a) as authorizing it to correct "an evident material miscalculation of figures" only if the miscalculation appeared "on the face of the award." *Id.* at 1085. Because the alleged double counting at issue appeared only upon looking to the arbitration record, the district court concluded that it lacked authority to modify the award. For that reason, it denied Mid Atlantic's motion to modify and granted Ms. Bien and Mr. Wellman's motion to confirm the award.

After receiving proposed judgments from the parties, in April 2018, the district court entered an amended final judgment. That judgment awarded Ms. Bien and Mr. Wellman damages, attorney's fees, and costs in the same amounts that the arbitration panel had specified. The court likewise confirmed the arbitration panel's award of 8% yearly prejudgment interest on the damages—but with no interest on the attorney's fees or costs. As for postjudgment interest, the

8

court applied the 2.1% federal rate listed in 28 U.S.C. § 1961. Lastly, the district court ordered Ms. Bien and Mr. Wellman to reassign to Mid Atlantic their ownership interests in their investments in Sonoma Ridge Partners and KBS, including any associated distributions that they had received since the arbitration award (as well as interest thereon).

## C

Both parties filed timely appeals from the amended final judgment. Mid Atlantic's appeal presents one question for our review: Did the district court err by holding that it lacked authority to modify the arbitration award to correct an alleged evident material miscalculation of figures because that miscalculation does not appear on the face of the arbitration award? In their cross-appeal, Ms. Bien and Mr. Wellman raise three questions. Did the district court err by (1) granting post-award interest on damages, but not on attorney's fees and other costs; (2) awarding postjudgment interest at the federal rate; and (3) ordering Ms. Bien and Mr. Wellman to reassign to Mid Atlantic any post-award distributions from their ownership interests in Sonoma Ridge Partners and KBS (as well as interest thereon).

## II

In answering these questions, we "review the district court's factual findings for clear error and its legal determinations de novo." *Burlington N. &*

9

*Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 567 (10th Cir. 2010).

We "must give extreme deference" to the arbitration panel's conclusions because

our "review of arbitral awards is among the narrowest known to law."  *THI of*

*N.M. at Vida Encantada, LLC v. Lovato*, 864 F.3d 1080, 1083 (10th Cir. 2017)

(emphasis omitted) (quoting *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th

Cir. 2000)).  Given this limited review, we should "exercise 'great caution' when

a party asks for an arbitration award to be set aside" or modified.  *Id.* (quoting

*Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982).  Indeed,

"[o]nce an arbitration award is entered, the finality of arbitration weighs heavily

in its favor and cannot be upset except under exceptional circumstances."

*Burlington*, 636 F.3d at 567 (quoting *Ormsbee*, 668 F.2d at 1146–47).

More specifically, the party seeking vacatur or modification bears the

burden of establishing a ground for relief under either 9 U.S.C. § 10 or § 11—that

is, § 10 or § 11 of the Federal Arbitration Act ("FAA").[3]  *See Frazier v.*

---

[3]      In addition to the reasons for vacatur and modification listed in §§ 10 and 11, this circuit has recognized "a handful of judicially created reasons." *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001) (quoting *Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.*, 119 F.3d 847, 849 (10th Cir. 1997)).  But the Supreme Court cast doubt on the vitality of those judicially created reasons in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008); *see id.* at 584 ("We now hold that §§ 10 and 11 respectively provide the FAA's exclusive grounds for expedited vacatur and modification."); *see also Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010) ("We do not decide whether 'manifest disregard' survives our decision in *Hall Street* . . . as an independent ground for review or as a judicial gloss on the enumerated

(continued...)

*CitiFinancial Corp., LLC*, 604 F.3d 1313, 1324 (11th Cir. 2010); *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 194 (4th Cir. 1998). If the party cannot carry this burden, "[i]t [will] not [be] enough . . . to show that the [arbitration] panel committed an error—or even a serious error." *Stolt-Nielsen*, 559 U.S. at 671; *see id.* at 696 (Ginsburg, J., dissenting) (noting that we "may not disturb the arbitrators' judgment, even if convinced that 'serious error' infected the panel's award" (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987))); *accord Oxford Health Plans, LLC v. Sutter*, 569 U.S. 564, 569 (2013); *cf. Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 511 n.2 (2001) (per curiam) (noting that the arbitrator's "decision hardly qualifies as serious error, let alone irrational or inexplicable error" and "any such error would not justify the actions taken by the [circuit] court [in rejecting the arbitrator's findings]").

---

[3](...continued)
grounds for vacatur set forth at 9 U.S.C. § 10."); *DMA Int'l, Inc. v. Qwest Commc'ns Int'l, Inc.*, 585 F.3d 1341, 1344 n.2 (10th Cir. 2009) (declining to resolve the "interesting issue" of whether the judicially created reasons for vacatur and modification survived *Hall Street*). Because only the first part of § 11(a) is at issue here, we need not and thus do not opine on the continuing vitality of the judicially created reasons for vacatur or modification. *See Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010) (explaining that we answer "only the questions we must, not those we can").

## III

Guided by those standards, we turn first to the question Mid Atlantic raises in its appeal. That question has two parts. First, does 9 U.S.C. § 11(a) permit courts to look beyond the face of the arbitration award when deciding whether to modify an award to correct an alleged evident material miscalculation of figures? And second, if not, does the face of the arbitration award here contain an evident material miscalculation of figures? As explained below, we answer each question in the negative.

## A

Section 11(a) authorizes courts to modify an arbitration award if it contains "an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award." 9 U.S.C. § 11(a). We are concerned with only the first half of § 11(a)—the "evident material miscalculation of figures" portion.[4] The district court read that

---

[4]    Section 11 reads in full:

> In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
>
>> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
>>
>> (b) Where the arbitrators have awarded upon a matter not

(continued...)

12

phrase as allowing it to correct only those miscalculations that appear on the face of the award. Mid Atlantic argues that the district court erred in interpreting the text of § 11(a) to embody such a face-of-the-award limitation.

Whether § 11(a) permits courts to go beyond the face of the arbitration award in looking for an evident material miscalculation of figures is a question of first impression in this circuit. We answer that question in the negative: that is, we conclude that § 11(a) embodies a face-of-the-award limitation. In reaching that conclusion, first and foremost, we draw inferences from the text and context of the FAA. Our independent reading of this text and context is reinforced by our recognition of the narrow and deferential standard of review applicable in the arbitration context. We close our analysis of this matter by recognizing, moreover, that the persuasive authority of our sister circuits has reached a similar conclusion.

---

[4](...continued)

> submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
>
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

> The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

9 U.S.C. §11. Because the parties do not argue that the other authorizations in subsections (a), (b), or (c) apply, we do not consider them as separate bases of authority to modify the award. Unless otherwise indicated, when referring to § 11(a), we mean only the "evident material miscalculation of figures" language.

13

**1**

We must interpret § 11(a) as written. *See, e.g.*, *Henry Schein, Inc. v. Archer and White Sales, Inc.*, --- U.S. ----, 139 S. Ct. 524, 529 (2019). That endeavor entails giving words their plain meaning when "read in their context and with a view to their place in the overall statutory scheme." *Home Depot U.S.A., Inc. v. Jackson*, --- U.S. ----, 139 S. Ct. 1743, 1748 (2019) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56–58 (2012) (discussing the "Supremacy-of-Text Principle"). Doing so, we conclude that § 11(a) embodies a face-of-the-award limitation.

Let's start with § 11(a)'s plain meaning. *See Jones v. Comm'r*, 560 F.3d 1196, 1200 (10th Cir. 2009). That section says, in relevant part, that a court may modify an award if it contains "an evident material miscalculation of figures." 9 U.S.C. § 11(a). In ordinarily English, a "miscalculation of figures" refers to mathematical, not legal, errors. *See Calculate*, NEW OXFORD AMERICAN DICTIONARY 242 (2d ed. 2005) ("Determine (the amount or number of something) mathematically."); *Figure*, *id.* at 626 (defining "figures" as "arithmetical calculations"). Likewise, "material" in this context takes its ordinary meaning of "important; essential; relevant." *Material*, *id.* at 1045. The word "evident," too,

14

takes its ordinary meaning of "plain or obvious." *Evident*, *id.* at 585.[5] The

parties do not appear to dispute the ordinary meaning of these terms. *See, e.g.*,

Mid Atlantic's Opening Br. at 19–21; Ms. Bien & Mr. Wellman's Resp. &

Principal Br. at 17. Putting these definitions together, we read § 11(a) to allow

courts to correct obvious, significant mathematical errors.

But even with these dictionary definitions, the meaning of

§ 11(a)—particularly the word "evident"—is not clear. Must a miscalculation be

obvious on the face of the award or must it be obvious after one looks to the

arbitration record? Devoid of context, the text arguably could support either

possibility. Fealty to text, however, is more than blind adherence to dictionary

definitions; we must consider context. *See Jackson*, 139 S. Ct. at 1748 ("It is a

fundamental canon of statutory construction that the words of a statute must be

read in their context and with a view to their place in the overall statutory

---

[5]     Other established dictionaries have similar definitions. For example, consider the American Heritage Dictionary. *See, e.g.*, *Calculate*, THE AMERICAN HERITAGE DICTIONARY 271 (3d ed. 1992) ("To perform a mathematical process; figure[.]"); *Figures*, *id.* at 679 (defining the term as "[m]athematical calculations" or "[a]n amount represented in numbers"); *Evident*, *id.* at 636 ("Easily seen or understood; obvious."); *Material*, *id.* at 1109 ("Being both relevant and consequential; crucial[.]"). Or, alternatively, examine Webster's Third New International Dictionary. *See, e.g.*, *Calculate*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 315 (2002) (defining the term as "to ascertain or determine by mathematical processes"); *Figure*, *id.* at 848 (defining the term as "arithmetical calculations" or "a number symbol (as one of the arabic numerals)"); *Evident*, *id.* at 789 (defining the term as "clear to the understanding: obvious, manifest, apparent (small capitals omitted)); *Material*, *id.* at 1392 (meaning "being of real importance or great consequence").

scheme." (quoting *Davis*, 489 U.S. at 809); *see also United States v. Santos*, 553 U.S. 507, 532 (2020) (Alito, J., dissenting) ("I do not suggest that the question presented in this case can be answered simply by opening a dictionary. When a word has more than one meaning, the meaning that is intended is often made clear by the context in which the word is used . . . ."); *see also* Scalia & Garner, *supra*, at 33 ("[V]agueness can often be clarified by context."); *cf. Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.) ("Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning."), *aff'd on other grounds*, 326 U.S. 404 (1945). And § 11(a)'s context supports reading the term "evident" as contemplating a face-of-the-award limitation.

Consider the FAA's purposes. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) (noting the importance of considering a statute's textually derived purpose in interpreting a provision). Its "'principal purpose' . . . is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (alteration

16

in original) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).  "This purpose is readily apparent from the FAA's text." *Id.*  And it "reflects the overarching principle that arbitration is a matter of contract." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013).  Moreover, part of the parties' arbitration contract is their "bargain[] for the arbitrator's construction of their agreement." *Oxford Health Plans*, 569 U.S. at 569 (quoting *E. Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62 (2000)).  In striking that bargain, the parties "trade[] the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

Reading this statutory term "evident" as relating to a material miscalculation that appears on the face of the award furthers the FAA's purposes.  A face-of-the-award limitation preserves the integrity of the parties' bargain.  Specifically, it preserves the parties' deal for an arbitrator's, rather than a court's, resolution of their dispute.  This bargain essentially negates the risk that a court may substitute its judgment (inadvertently or otherwise) for that of the arbitrator when it goes beyond the award's face in search of obvious, material mathematical errors.  Further, a face-of-the-award approach also ensures that arbitration

17

remains an efficient means to resolve disputes rather than "merely a prelude to a more cumbersome and time-consuming judicial review process." *Hall St.*, 552 U.S. at 588 (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003)). Reading § 11(a) to allow courts to hunt through the arbitration record for "evident" miscalculations "opens the door to the full-bore legal and evidentiary appeals" that the parties would have contracted to avoid. *Id.* Faced with one interpretation of § 11(a) that furthers the FAA's purposes and one that undermines them, we prefer the former. *See Abramski*, 573 U.S. at 181; *cf. AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (reading the second half of §11(a) as incorporating a face-of-the-award limitation partly because that reading was "consistent with the purpose of the [FAA]").

The FAA's history supports this reading. "When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 587 U.S. ----, 139 S. Ct. 1795, 1801 (2019) (quoting *Hall v. Hall*, 584 U.S. ----, 138 S. Ct. 1118, 1128 (2018)); *see also AIG Baker*, 508 F.3d at 1000 (noting that it was "be[ing] guided by the established meaning that the words of section 11(a) had at the time they were adopted"). Congress enacted the FAA in 1925 and lifted the statute's text from "New York's [1920] arbitration statute." *Hall St.*, 552 U.S. at 589 n.7; *accord AIG Baker*, 508 F.3d at

18

1000; *see also Hall St.*, 552 U.S. at 589 n.7 ("The text of the FAA was based upon that of New York's arbitration statute. . . .  The New York Arbitration Law incorporated pre-existing provisions of the New York Code of Civil Procedure."). Section 11(a)'s text, in particular, was "virtually identical" to New York's provision in effect in 1925.  *Hall St.*, 552 U.S. at 589 n.7;  *see AIG Baker*, 508 F.3d at 1000 ("The language of section 11(a) of the federal Act matched almost verbatim the language of section 2375 of the New York Code of Civil Procedure, which had long been a part of New York law and the New York Arbitration Law incorporated by reference.").  That provision allowed courts to modify an arbitration award to correct "an evident miscalculation of figures."  N.Y. CODE CIV. P. § 2375 (Frank B. Gilbert & Austin B. Griffin 1920).

By the time Congress transplanted that language into § 11(a), New York courts had long interpreted the language "an evident miscalculation of figures" to mean a miscalculation that appeared in the award "on its face."  *In re Burke*, 84 N.E. 405, 406 (N.Y. 1908); *see Remington Paper Co. v. London Assurance Corp. of Eng.*, 12 A.D. 218, 225 (N.Y. App. Div. 1896) (affirming order concluding that "[t]he party who seeks to set aside an award upon the ground of mistake must show, from the award itself, that but for the mistake the award would have been different" (quoting *Sweet v. Morrison*, 22 N.E. 276, 280 (N.Y. 1889))); *see also*

19

*AIG Baker*, 508 F.3d at 1001 (collecting New York cases showing that this reading has "been part of New York jurisprudence for many years").

The face-of-the-award limitation therefore "was part of the 'old soil'" that § 11(a) brought with it from New York law. *AIG Baker*, 508 F.3d at 1001. Over the intervening decades, Congress has left the "evident material miscalculation" language untouched. *Compare* Pub. L. No. 68-401, § 11(a), 43 Stat. 883, 885 (1925), *with* 9 U.S.C. § 11(a) (2019). Therefore, we must not, in effect, do what Congress has not done by effacing the face-of-the-award limitation that has long been old soil attached to § 11(a).

Looking to the FAA's structure confirms what its purposes and statutory history have already taught. Sections 9 through 11 of the FAA provide for "expedited judicial review to confirm, vacate, or modify arbitration awards." *Hall St.*, 552 U.S. at 578. Section 9 "unequivocally" commands that courts "'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected." *Id.* at 582. Section 11(a) likewise allows for modifications only to "address egregious departures from the parties' agreed-upon arbitration." *Id.* at 586. This structure counsels narrowly interpreting § 11(a). *Cf.* Scalia & Garner, *supra*, at 362–63 (noting that narrowly interpreting exceptions is warranted if the text indicates such a preference). The broad construction that Mid Atlantic proposes would transform § 11(a) from an exception to address egregious

circumstances into a freewheeling authorization for the courts to dig through the arbitration record in search of significant miscalculations. On the other hand, our construction—that limits the courts to considering the face of the award—preserves § 11(a)'s status as a narrow exception to "the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Id.* at 588; *see AIG Baker*, 508 F.3d at 1001 ("This appeal illustrates the danger of broad judicial review of arbitration awards. The parties elected to settle their dispute by arbitration rather than litigation, but this appeal is now before us after more than three years of litigation.").

This reading of § 11(a) draws additional support from the narrow and deferential standard of review applicable in the arbitration context. Recall that our "review of arbitral awards" is "*among the narrowest known to law*." *Lovato*, 864 F.3d at 1083 (quoting *Brown*, 220 F.3d at 1182). We therefore do "not sit to hear claims of factual or legal error by an arbitrator." *Stolt-Nielsen*, 559 U.S. at 696 (Ginsburg, J., dissenting) (quoting *Misco*, 484 U.S. at 38); *accord Oxford Health Plans*, 569 U.S. at 569. Nor may we "disturb the arbitrators' judgment, even if convinced that 'serious error' infected the panel's award." *Stolt-Nielsen*, 559 U.S. at 696 (Ginsburg, J., dissenting) (quoting *Misco*, 484 U.S. at 38). Consistent with this limited review, we "exercise 'great caution' when a party asks for an arbitration award to be set aside" or modified. *Lovato*, 864 F.3d at

21

1083 (quoting *Ormsbee*, 668 F.2d at 1147). Indeed, "[o]nce an arbitration award is entered, the finality of arbitration weighs heavily in its favor and cannot be upset except under exceptional circumstances." *Burlington*, 636 F.3d at 567 (quoting *Ormsbee*, 668 F.2d at 1146–47). While § 11(a) enumerates one such circumstance, it does *not* override the "extreme deference" we owe the arbitration award. *Lovato*, 864 F.3d at 1083 (emphasis omitted) (quoting *Brown*, 220 F.3d at 1182). Similarly, if we read § 11(a) to allow courts to hunt for errors lurking in the arbitration record—as Mid Atlantic does—we undercut such deference and open up arbitration awards to judicial second-guessing. We cannot countenance such a departure from our narrow and deferential review of arbitration awards.

Mid Atlantic's primary textual argument against the face-of-the-award limitation is unpersuasive.[6] It argues that "[t]he only way to determine whether a

_____

[6]    Ms. Bien and Mr. Wellman argue that Mid Atlantic "failed to raise its arguments regarding the 'on the face of the award' requirement . . . with the District Court." Ms. Bien & Mr. Wellman's Resp. & Principal Br. at 27. The record belies this suggestion. The district court noted that Mid Atlantic had cited authority for the proposition "that a court may look beyond the face of an award to correct a double recovery under 9 U.S.C. § 11(a)" and then rejected that argument. Aplt.'s App., Vol. V, at 1085 n.4. Even if there was some meaningful doubt as to whether Mid Atlantic did enough to preserve its face-of-the award argument, we have discretion to consider unpreserved issues on appeal. *See, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary."). And under these circumstances—where the district court recognized that the theory Mid Atlantic presents on appeal was at play in the litigation and rejected it—we exercise our discretion to consider that theory on appeal. *Cf. United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328
(continued...)

22

miscalculation or mistake is 'material' is to analyze the [arbitration] record." Mid Atlantic's Opening Br. at 20. And thus, as Mid Atlantic reasons, § 11(a) could not embody a face-of-the-award limitation because such a limitation would give the term "material" no effect.

We find this reasoning wholly unpersuasive. Take a hypothetical award that orders the defendant to pay $100,000 in punitive damages and $100,000 in compensatory damages but then adds these figures on the award's face for a total of $2,000,000. One need not dive into the arbitration record to say that the award includes a significant (i.e., material) mathematical error. It is untrue, then, that a face-of-the-award limitation renders null § 11(a)'s materiality requirement.

We are similarly unmoved by Mid Atlantic's related policy argument that a face-of-the-award limitation effectively produces arbitrary results. To illustrate these supposedly arbitrary results, Mid Atlantic offers the following hypothetical:

> [C]onsider a hypothetical award which grants postjudgment interest at the rate of 8%. Assume further that the award does not cite any source for the 8% rate of interest, but that the parties had in fact stipulated to the statute governing interest and that statute provides for a 4% rate of interest. In other words, assume the 8% interest rate is indisputably wrong but the "face of the award" does not contain information required to reach that conclusion. Under the District Court's interpretation, this error cannot be corrected.

---

[6](...continued)
(10th Cir. 2003) ("[W]hen the district court *sua sponte* raises and explicitly resolves an issue of law on the merits, the appellant may challenge that ruling on appeal . . . .").

23

*Id.* at 28–29. According to Mid Atlantic, this hypothetical outcome is arbitrary. And Mid Atlantic reasons that it "advances zero compelling policy interests" to prevent courts from correcting this error concerning the interest rate, when—even under the face-of-the-award approach—courts would have been able to correct the error if the award had referenced explicitly the parties' stipulation concerning the 4% interest rate. *Id.* at 29. Mid Atlantic concludes that the face-of-the-award approach thus "leaves the question of whether clear math errors can be corrected up to the random chance that arbitrators 'show their work.'" *Id.*

Yet, contrary to Mid Atlantic's contentions, the FAA's purpose, history, and structure make it clear that this is precisely how Congress intended § 11(a) to function. And its operation is not arbitrary at all. Section 11 authorizes courts to review an arbitration award—not the arbitration record. *See* 9 U.S.C. § 11 (permitting courts to "make an order modifying or correcting *the award*" (emphasis added)); *see also Fellus v. Sterne, Agee & Leach, Inc.*, 783 F. Supp. 2d 612, 622 (S.D.N.Y. 2011) (declining to correct an award because the plaintiff could "not point to any patently obvious miscalculation on the face of the award, nor can it do so, for the award does not explain the arbitrators' rationale . . . or reference any numbers other than the total damages awarded"); *cf. ARW Expl. Corp. v. Aguirre*, 45 F.3d 1455, 1463 (10th Cir. 1995) ("[C]ourts are not to instruct the arbitrator as to the correct computation of damages."). Further, the

24

face-of-the-award approach is congruent with Congress's purpose of providing "just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway." *Hall St.*, 552 U.S. at 588. Irrespective of whether Mid Atlantic considers this purpose to be the stuff of compelling public policy, that is Congress's judgment, and we are obliged to defer to it.

What's more in dispelling Mid Atlantic's misguided notion that the statute functions in an arbitrary manner—under a face-of-the-award approach—it is important to keep in mind that "arbitration is a matter of contract." *Henry Schein*, 139 S. Ct. at 529. If Mid Atlantic wished to avoid the supposedly random chance that the arbitration panel would not show its work, it could have contracted for a fully explained award. *See Am. Express*, 570 U.S. at 233 (noting that parties can contract to specify the arbitrator and the rules for arbitration); *United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598 (1960) ("Arbitrators have no obligation to the court to give their reasons for an award."). But Mid Atlantic did not do so. In fact, the current contracts lead us to the opposite conclusion. Most obviously, Mid Atlantic's contracts with Ms. Bien and Mr. Wellman specify, "[t]he arbitrators do not have to explain the reason(s) for their award." Aplt.'s App., Vol. III, at 737. We thus cannot (and would not attempt to) rewrite the parties' contracts just because Mid Atlantic is now dissatisfied with the fruits of its bargain. After all, "by agreeing to arbitrate,"

25

Mid Atlantic traded "procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Gilmer*, 500 U.S. at 31 (quoting *Mitsubishi*, 473 U.S. at 628). Stated otherwise, that Mid Atlantic is displeased with the level of informality with which the arbitration panel resolved the dispute is not cause to undo the bargain it struck with Ms. Bien and Mr. Wellman. *Cf. Beumer Corp. v. ProEnergy Servs., LLC*, 899 F.3d 564, 566 (8th Cir. 2018) ("The parties bargained for the arbitrator's decision; if the arbitrator got it wrong, then that was part of the bargain.").

In sum, we conclude that § 11(a) allows courts to correct only those evident material miscalculations that appear on the face of the award. The provision's text compels that conclusion, when it is read in the context of the FAA's purposes, history, and structure. And this conclusion is bolstered by the narrow and deferential standard of review applicable in the arbitration context.

**2**

Persuasive authority from our sister circuits confirms our reading of § 11(a). Take the Fourth Circuit's decision in *Apex Plumbing Supply*. As part of the award there, the arbitrator compensated Apex for the value of its inventory. But in calculating that figure, the arbitrator wrongly included the value of inventory over one year old. *See* 142 F.3d at 193. This inadvertently large figure for Apex's inventory value made its way into the final arbitration award;

26

however, the mathematical calculations by which the arbitrator arrived at that figure did not. U.S. Supply therefore moved under § 11(a) to correct this error. The district court, however, denied that motion. On appeal, the Fourth Circuit affirmed, emphasizing the "severely circumscribed" review that federal courts have of arbitration awards and the fact that § 11 "allows modification of an arbitrator's award only in limited instances." *Id.* With these considerations in mind, the court determined that the "claimed miscalculation of the inventory's value . . . was not 'evident' because it did not appear on the face of the arbitration award." *Id.* at 194. Thus, the Fourth Circuit held that the district court correctly declined to modify the award.

The Fourth Circuit's reasoning and holding in *Apex* buttress ours. As we do here, *Apex* grounds its holding on § 11(a)'s text—read in the context of the federal courts' "severely circumscribed" review of arbitration awards. *Id.* at 193. From this text and context, the Fourth Circuit interpreted "evident" to mean that a miscalculation must "appear on the face of the arbitration award" to satisfy § 11(a). *Id.* at 194. The court's conclusion and its reasoning are congruent with our own holding.

To escape this potent and persuasive authority, Mid Atlantic tries to distinguish *Apex*. In doing so, it casts that case as one involving "an alleged miscalculation of a line item in an arbitration award." Mid Atlantic's Opening

27

Br. at 26.  But that fact does not distinguish *Apex* from this case.  Indeed, akin to the error in *Apex*, the miscalculation here involves an alleged duplication of a line item in an arbitration award.  *Compare id.* at 17 (complaining that the arbitration panel awarded net-out-of-pocket losses *and* market-adjusted damages), *with Apex*, 142 F.3d at 193 (summarizing U.S. Supply's complaint that the arbitration panel "included inventory over one year old in its valuation of Apex's entire inventory").  So Mid Atlantic's effort to distinguish *Apex* falls flat.

Trying a different tack, Mid Atlantic faults *Apex* for "borrow[ing] the 'face of the award' phrasing from *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 757 F. Supp. 283, 288 (S.D.N.Y. 1991)."  Mid Atlantic's Opening Br. at 27.  As Mid Atlantic points out, *Hough* involved New York's arbitration statute, not the FAA.  Implicit in that observation is the critique that by citing a case interpreting New York law to support its view that § 11(a) includes a face-of-the-award limitation, the *Apex* court effectively undercut the persuasive value of its reasoning.

Such an implicit critique, however, is misguided because of the close connection between New York arbitration law and the FAA—especially with respect to the language of § 11(a).  As discussed above, the New York provision operative in 1925 allowed courts to correct "an evident miscalculation of figures."  N.Y. Code Civ. P. § 2375, *supra*.  Congress transplanted that language into

28

§ 11(a). And by the time it did so, New York courts had long interpreted it to mean a miscalculation that appears on the face of the award. *See In re Burke*, 84 N.E. at 406. In borrowing that "evident miscalculation of figures" language from New York law, as noted, Congress also borrowed the New York courts' longstanding interpretation of that phrase as including a face-of-the-award limitation. Therefore, Mid Atlantic's implicit critique of *Apex* for its reliance on New York law, and in particular on *Hough*, is misguided.

To be sure, although Congress has left the relevant language of § 11(a) intact, New York has amended its counterpart to § 11(a) to omit the word "evident." That is, the New York provision in effect today *and* when *Hough* was decided allows courts to modify awards if "there was a miscalculation of figures." N.Y. C.P.L.R. § 7511(c)(1). But, importantly, even though New York's amended text conceivably could contemplate a more searching judicial inquiry because of the elimination of the restrictive term "evident," New York courts continue "to require that the miscalculation appear on the face of the award." *Avamer Assocs., L.P. v. 57 St. Assocs., L.P.*, 67 A.D. 3d 483, 484 (N.Y. App. Div. 2009).[7]

---

[7]  *See also Cardinale v. 267 Sixth Street LLC*, No. 13 Civ. 4845 (JFK), 2014 WL 4799691, at *9 (S.D.N.Y. Sept. 26, 2014) (unpublished) (citing *Hough* for proposition that New York law and FAA, generally limits modification to "patently obvious mistakes on the face of the award"); *Hemlall v. Ngo*, No. 2008-1825 QC, 2009 WL 3297542, at *1 (N.Y. Sup. Ct. Oct. 8, 2009) (unpublished) ("We are of the view that plaintiff's motion [to modify award] was properly denied since a mathematical error in the computation of damages was not evident

(continued...)

29

Consequently, *Apex* was on solid ground in relying on New York law—and, more specifically, *Hough*—in holding that § 11(a) contemplates a face-of-the-award limitation.

Mid Atlantic also complains that *Apex*, in any event, misread *Hough*. It contends that the language from *Hough* that *Apex* relied on was taken out of context, resulting in *Apex*'s misreading of *Hough*'s import. Set in its full context, Mid Atlantic explains, the *Hough* language that *Apex* relies on reads: "Where no mathematical error appears on the face of the award *and where no computational error can be clearly inferred*, an arbitration award will not be altered." Mid Atlantic's Opening Br. at 27 (quoting *Hough*, 757 F. Supp. at 288). But *Apex* omitted the italicized language. *See* 142 F.3d at 194. And that "clearly inferred" language, Mid Atlantic posits, proves that the phrase "face of the award" is "non-statutory shorthand" that imposes no "actual requirement that district courts ignore a properly submitted arbitration record" in determining whether an award has an "evident material miscalculation." Mid Atlantic's Opening Br. at 27–28. Put differently, Mid Atlantic argues that the "face of the award" language

---

[7](...continued) from the face of the award."); 23A CARMODY-WAIT N.Y. PRACTICE WITH FORMS § 141:256 Westlaw (database updated March 2020) ("[A] modification based upon the statutory ground of a miscalculation of figures is proper only where a mathematical error in the computation of damages is evident from the face of the award."); 5 N.Y. JUR. 2D ARBITRATION AND AWARD § 280 Westlaw (database updated February 2020) ("Mistakes apparent on the face of the award may be corrected in an action brought for that purpose . . . .").

encompasses clear inferences that courts may glean from the arbitration record. In this sense, it reasons that *Hough*—and by extension, *Apex*—"actually supports [its] position here." *Id.* at 27.

We disagree. *Hough*'s "clearly inferred" language came from an earlier New York case, *City of Troy v. Village of Menands*, 48 A.D. 2d 733, 734 (N.Y. Sup. Ct. 1975). *See Hough*, 757 F. Supp. at 288 (citing *City of Troy*). However, neither *City of Troy* nor *Hough* specified the source from which courts are to make these inferences. And, without citation to any supportive legal authority, Mid Atlantic has no clear footing to support its position; instead, it baldly contends that this language contemplates that courts may look to the arbitration record for those inferences. This view is unpersuasive because one may naturally read the "clearly inferred" language as being entirely consistent with a face-of-the-award limitation. And, such a reading would be congruent with the long line of New York cases that have historically endorsed such a limitation. *See, e.g.*, *In re Burke*, 84 N.E. at 46. Specifically, the language "clearly inferred" (as it appears in *City of Troy* and *Hough*) naturally could be read to mean that courts are still limited to the face of the award in looking for obvious, material miscalculations, but that the face-of-the-award limitation simply includes, not only obvious mathematical errors that can be discerned from the explicit

31

computations of the award (e.g., 2+2=5), but also such errors that can be clearly inferred from the language and other figures of the award.

Under such a reading, the sole touchstone for the court's analysis would still be the face of the award. And crucially, the arbitration record would remain off limits. Indeed, at least one New York court quoting *City of Troy*'s "clearly inferred" statement has read that language precisely in this manner. *See Curtis Lumber Co. v. Am. Energy Care, Inc.*, 910 N.Y.S. 2d 761, 2010 WL 1756883 at *4, (N.Y. Sup. Ct. Apr. 30, 2010) (unpublished) (reading "miscalculation of figures" to mean "'mathematical errors on the face of the . . . award' or 'computational errors [that] can be clearly inferred' *from the award*" (alterations in original) (emphasis added) (quoting *City of Troy*, 48 A.D. 2d at 734)). And we have discerned no contrary view in other New York cases. Thus, as we see it, neither the "clearly inferred" language in *Hough* nor *Apex*'s reliance on *Hough* "actually supports" Mid Atlantic's position. Mid Atlantic's Opening Br. at 27.

Finally, Mid Atlantic wrongly claims that *Apex* did "not identify a statutory basis for limiting a court's review to errors that appear 'on the face of the award.'" Mid Atlantic's Reply & Resp. Br. at 8. However, as we do, *Apex* grounded the face-of-the-award limitation in § 11(a)'s text—namely, the word "evident." *See Apex*, 142 F.3d at 194 ("[T]he miscalculation was not 'evident' because it did not appear on the face of the arbitration award."). In short, despite

32

Mid Atlantic's arguments to the contrary, *Apex* supports our holding that § 11(a) allows district courts to correct only those material miscalculations that appear on the face of the award.

We find similar (though admittedly less robust) support in *Grain v. Trinity Health, Mercy Health Services Inc.*, 551 F.3d 374 (6th Cir. 2008). In that case, a married couple won a sizable arbitration award but moved to modify the award to correct "an evident material miscalculation of figures." *Id.* at 378 (quoting 9 U.S.C. § 11(a)). However, because the couple "failed to raise this argument in the district court," the Sixth Circuit did not address it at length. *Id.* But the court considered the argument enough to read the phrase "an evident . . . miscalculation of figures" to mean "a computational error in determining the total amount of an award—what the Fourth Circuit calls 'a mathematical error appear[ing] *on the face of the award*.'" *Id.* (alterations in original) (emphasis added) (quoting *Apex*, 142 F.3d at 194). "No such error appear[ed] on the face of the award," the Sixth Circuit concluded. *Id.* at 379. Indeed, rather than "complaining that the arbitrators made an obvious numerical gaffe in computing the total award," the couple had argued "that the arbitrators made a mistake on the merits." *Id.* "Whatever else such an alleged error may be," the Sixth Circuit explained that it was "not 'an evident material miscalculation of figures.'" *Id.*

33

*Grain* supports our reading of § 11(a). Guided by *Apex*, *Grain* focused on the statutory text and concluded that, for the error to be "evident" within the meaning of § 11(a), it must appear "on the face of the award." *Id.* And *Grain* concluded that the couple could not demonstrate that its alleged error satisfied this standard. Thus, *Grain* is persuasive support for the face-of-the-award holding we reach here.

We recognize that Mid Atlantic marshals certain cases that purportedly bolster its position. Chief among them is *Eljer Manufacturing, Inc. v. Kowin Development Corp.*, 14 F.3d 1250 (7th Cir. 1994). The arbitration award there gave the defendant, Kowin, almost $15 million in damages. *See* 14 F.3d at 1253. The award divided these damages "into three separate" categories of (1) about $3 million, (2) around $8.4 million, and (3) $3.5 million. *Id.* The award itself did not clarify what these amounts represented or how the arbitrator calculated them. *Id.* But as it turned out, the three categories "duplicated precisely the amounts requested by Kowin in the damages section of its post-hearing brief." *Id.* By consulting that brief, the district court determined that the first category inadvertently included $1.25 million that Eljer had already paid Kowin, and that the third category included $2.5 million that the first category had already accounted for. To correct these errors, the district court granted Eljer's motion for modification under § 11. Kowin appealed this decision.

The Seventh Circuit in *Eljer* agreed with the district court that the "[t]he basis for each of the arbitrator's awards" was Kowin's brief. *Id.* at 1254. It rejected Kowin's contention that "the [district] court's reduction of the award rest[ed] on impermissible speculation as to what each of the arbitrator's three awards was attempting to redress," reasoning that "[i]t was hardly speculative for the district court to base its analysis on Kowin's own explanation of its damages." *Id.* The court observed that "Kowin confuses a narrow standard of review with a nonexistent standard of review." *Id.* With this information from beyond the face of the award, the Seventh Circuit concluded that the award provided for double recoveries. And it reasoned that a "[d]ouble recovery constitutes a materially unjust miscalculation which may be modified under section 11." *Id.* Thus, the Seventh Circuit affirmed the district court's order modifying the award. *See id.* at 1257.

The face-of-the-award limitation that we adopt here is admittedly in some tension with the Seventh Circuit's decision in *Eljer*. But we do not find *Eljer*'s analysis persuasive, and, thus, it gives us no pause. *See, e.g.*, *United States v. Krueger*, 809 F.3d 1109, 1116 n.9 (10th Cir. 2015) (declining to rely on "unpersuasive out-of-circuit cases"). For starters, *Eljer* did not expressly hold that § 11(a) permits district courts to go beyond the face of the arbitration award to find evident material mathematical miscalculations. And, notably, *Eljer*

35

undertook no textual analysis of § 11(a); for instance, the word "evident" appears nowhere in the body of the opinion. *See Eljer*, 14 F.3d at 1253 n.4. This failing is particularly salient given the Supreme Court's repeated instruction to "interpret the [FAA] as written." *Henry Schein*, 139 S. Ct. at 529; *see also Hall St.*, 552 U.S. at 587–88. What's more, the non-textual analysis that does exist in *Eljer* comes in a brief discussion devoid of any on-point authority. *See* 14 F.3d at 1254 (citing two cases for the proposition that § 11 allows modification to correct double recovery but citing no authority for the proposition that courts may look beyond the face of the award to determine whether such a double recovery exists). Indeed, Mid Atlantic concedes that *Eljer* only "tacitly endorsed . . . review of the arbitration record." Mid Atlantic's Reply & Resp. Br. at 7. Therefore, we are not persuaded by *Eljer*'s analysis, and it does not lead us to question the face-of-the-award limitation we adopt here.

The other cases Mid Atlantic cites are similarly unpersuasive. Consider *Transnitro, Inc. v. M/V Wave*, 943 F.2d 471 (4th Cir. 1991). The arbitrator there awarded M/V damages accounting for, among other things, certain expenses that M/V had incurred and about $57,000 in interest that had accrued on a bond. After the award was issued, M/V discovered that it had failed to inform the arbitrator or Transnitro that it had already earned about $34,000 in interest on the bond. Likewise, M/V had not reported some $28,000 in expenses. In federal court,

36

Transnitro moved to modify the award to subtract the unreported $34,000 from the $57,000 interest award. For its part, M/V asked to collect the $28,000 in unreported expenses. The district court agreed to subtract the $34,000 from the interest award because it would be "unfair to permit [M/V] to reap the benefit of [its own] failure." *Id.* at 474. But fairness did not likewise compel the court to allow M/V to collect the unreported expenses.

On appeal, M/V argued "that the district court had no power under 9 U.S.C. § 11 to modify" the award because the provision's "last sentence . . . [which speaks of modifications to awards "so as to . . . promote justice between the parties"] d[id] not create an independent basis for modification." *Id.* at 373–74. Rather, it contended that § 11 authorized "modification only if the provisions of one of subparagraphs (a), (b) or (c) [were] met." *Id.* The Fourth Circuit sidestepped that question. It reasoned instead that whatever the effect of the last sentence of § 11, "there were, within the meaning of subsection (a), material mistakes made in the arbitration proceeding as to interest on the bond and . . . as to other expenses." *Id.* True, the court noted, "[t]hose errors were apparently not the fault of the arbitrators." *Id.* However, that fact did "not also mean that where there is 'an evident material mistake' attributable to one or both parties to an arbitration, a district court lacks power under subsection (a) to do *equity and justice*," the court explained. *Id.* (emphasis added). The Fourth Circuit further

37

reasoned that "the court below was right in reaching and correctly determining the interest issue. However, that court also should have reached and determined the additional expenses issue." *Id.* Therefore, the Fourth Circuit affirmed the interest modification and remanded for the district court to consider the expense issue further.

Mid Atlantic relies heavily on *Transnitro*. It reads that case as proof that "the Fourth Circuit . . . endorsed a review of material beyond even the arbitration record itself." Mid Atlantic's Opening Br. at 22. Mid Atlantic adds that *Transnitro* even "revers[ed] a district court's decision *not to correct* an error based upon a review of factual information that was never submitted to the arbitration Panel." *Id.* At bottom, Mid Atlantic reads *Transnitro* to stand for the proposition that when, "as here, there is a mathematical error in an award, the district court could have (and should have) looked at the materials in the arbitration record . . . to determine the fix for that mathematical error." *Id.* at 25.

Drilling down on it, however, *Transnitro* is less helpful than Mid Atlantic thinks. To begin, that case interpreted the language "evident material mistake" from the second half of § 11(a). *See Transnitro*, 943 F.2d at 474. And recall, we are concerned here with only the language from the first half of § 11(a), which authorizes courts to correct an "evident material miscalculation." To be sure, ordinarily, *Transnitro*'s interpretation of the second half of § 11(a) could not be

38

easily dismissed as irrelevant, given the presumption that a term, such as "evident," bears the same meaning throughout a statutory text. *See* Scalia & Garner, *supra*, at 170. But the Fourth Circuit—the same court that issued *Transnitro*—subsequently spoke in *Apex* to the precise meaning of "evident" *in the first half of § 11(a)* and held that a "miscalculation was not 'evident' because it did not appear on the face of the arbitration award." 142 F.3d at 194. For our purposes, then, *Apex*—not *Transnitro*—offers the Fourth Circuit's on-point determination of the language we are concerned about here. And that interpretation supports our holding.[8]

Even if *Transnitro* were the only word from the Fourth Circuit on § 11(a), we would respectfully decline to follow it because we are not persuaded by its analysis. *See Krueger*, 809 F.3d at 1116 n.9; *cf. AIG Baker*, 508 F.3d at 1000 ("We are convinced that the earlier decision of the Fourth Circuit in *Transnitro* is erroneous."). Significantly, the court in *Transnitro* seemed to draw and rely on a distinction between errors by arbitrators for which "relief under [the terms of] 9 U.S.C. § 11(a) would have been available," and errors by one or more litigants, as

---

[8]     Because *Apex* and *Transnitro* concern different portions of § 11(a), we do not interpret their holdings to directly conflict. As a result, the Fourth Circuit's interpretive rule that "[w]hen published panel opinions are in *direct* conflict on a given issue, the earliest opinion controls" plays no role in our analysis. *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) (emphasis added); *see United States v. Rosales-Miranda*, 755 F.3d 1253, 1261 (10th Cir. 2014) (recounting similar rule).

there, for which the district court had "power under subsection (a) to do *equity and justice*." 943 F.2d at 474 (emphasis added); *cf. AIG Baker*, 508 F.3d at 999 ("Because the arbitration panel crafts the award, only the panel can make a mistake in the award."). This suggests that *Transnitro*'s holding is inapposite because we are concerned here with an alleged error of the arbitrator, not a litigant. And this reading of *Transnitro* is supported by the fact that the court did not purport to engage with the terms of § 11(a)—which the court itself seem to recognize would be relevant only if the error was one committed by the arbitrator. *See* 943 F.2d at 474. Rather, the court appeared to rely on § 11(a) only as a source of equitable power. *See id.* at 474 (noting that district courts have the "power under subsection (a) to do *equity and justice*" (emphasis added)).

At the end of the day, what is important is what the *Transnitro* court did—and, especially, did *not* do—in reaching its holding, not the theory that motivated its actions. And, in addition to tacitly eschewing a textual analysis of § 11(a), the court in *Transnitro* did not consider the FAA's purposes, history, or structure in arriving at its holding. Yet, as explained above, it is these sources (combined with § 11(a)'s plain text) that ultimately led us to the conclusion that we reach here concerning the face-of-the-award limitation. Therefore, even if *Transnitro* were the only word from the Fourth Circuit on § 11(a), the fact that the court elided these key sources in reaching its holding would render it an

unpersuasive touchstone for our own interpretation of that provision. In sum, contrary to Mid Atlantic's reading of the case, we do not find that *Transnitro* speaks persuasively—if at all—to the circumstances before us.

We are likewise unpersuaded by *Valentine Sugars, Inc. v. Donau Corp.*, 981 F.2d 210 (5th Cir. 1993), which Mid Atlantic also cites. That case contains the following passage:

> Next, Valentine argues that we should vacate the award because it is based upon a material mistake of fact. Title 9 U.S.C. § 11(a) allows us to vacate an award "[w]here there was an evident material miscalculation of figures . . . ." The Sixth Circuit has held that "where the record that was before the arbitrator demonstrates an unambiguous and undisputed mistake of fact and the record demonstrates strong reliance on the mistake by the arbitrator in making his award, it can fairly be said that the arbitrator 'exceeded [his] powers or so imperfectly executed them' that vacation may be proper."

981 F.2d at 214 (alterations in original) (quoting *Nat'l Post Office Mailhandlers v. United States Postal Serv.*, 751 F.2d 834, 843 (6th Cir. 1985)). Later Fifth Circuit cases have read that passage as holding "that an 'evident material [mis]calculation' occurs 'where *the record* that was before the arbitrator demonstrates an unambiguous and undisputed mistake of fact and *the record* demonstrates strong reliance on that mistake by the arbitrator in making his award.'" *Prestige Ford v. Ford Dealer Comput. Servs., Inc.*, 324 F.3d 391, 396–97 (5th Cir. 2003) (emphasis added) (quoting *Valentine*, 981 F.2d at 214),

41

*overruled on other grounds by Hall St.*, 552 U.S. 576.  Viewed in this light,

*Valentine* arguably stands for the proposition that § 11(a) permits district courts

to look beyond the face of the arbitration award to the arbitration record.  While

this interpretation seems to conflict with the one we embrace today, we are not

persuaded by *Valentine*.

At its core, *Valentine* rests on an untenable reading of *National Post Office*.

*See Valentine*, 981 F.2d at 214 (relying on *National Post Office*).  In that case, the

Postal Service fired an employee who had been indicted for drug trafficking.  The

employee protested the discharge and initiated arbitration proceedings.  Although

the arbitrator had "doubts," he nevertheless "sustain[ed] the discharge."  751 F.2d

at 838.  The arbitrator's "written decision . . . includ[ed] the glaring misstatement

that the employee had pleaded guilty to marijuana trafficking . . . *prior to* the

Postal Service's discharge action."  *Id.* (emphasis added).  In truth, the employee

pleaded guilty "four weeks *after* the discharge."  *Id.*  Given such an error, the

employee's union moved to vacate the arbitration decision.  The district court

denied the motion.

The Sixth Circuit reversed.  It reasoned that when "the record that was

before the arbitrator demonstrates an unambiguous and undisputed mistake of fact

*and* the record demonstrates strong reliance on that mistake by the arbitrator in

making his award, it can fairly be said that the arbitrator 'exceeded [his] powers,

42

or so imperfectly executed them' that vacation may be proper." *Id.* at 843

(quoting 9 U.S.C. § 10(d)). Because it was "undisputed that [the] arbitrator . . .

was in error regarding the date of the employee's guilty plea" and that the error

"played a central if not essential role in his decision," the Sixth Circuit held that

vacatur was appropriate. *Id.* But rather than vacating and remanding for

"meaningless rearbitration," the court determined that "under 9 U.S.C. § 11, the

intent of [the] arbitrator['s] . . . award and the interests of justice . . . [would] best

be promoted by ordering simply that the employee be awarded back pay for the . .

. period between his discharge and the date he pleaded guilty." *Id.* at 844.

As this description suggests, properly read, *National Post Office* has

nothing to do with § 11(a) and the propriety of a face-of-the-award limitation.

Indeed, the case says nothing about what constitutes either "an evident material

miscalculation" or "an evident material mistake" and, in fact, does not even

include the word "face." 9 U.S.C. § 11(a). Rather, *National Post Office* speaks

to only when an arbitrator "so imperfectly executed" her powers that a court may

vacate the award under *another* provision of the FAA, which is now codified at

§ 10(a)(4).[9] As for § 11, at most, *National Post Office* read the last sentence of

§ 11 as allowing courts to modify awards to promote justice when the conditions

---

[9] The FAA provision that *National Post Office* relied on—9 U.S.C. § 10(d)—was moved in 1990 and is now codified at 9 U.S.C. § 10(a)(4). *See* Administrative Dispute Resolution Act, Pub. L. 101-552, §5, 104 Stat. 2745 (1990).

43

for vacatur are met. *Compare Nat'l Post Office*, 751 F.2d at 844 ("[W]e conclude that under 9 U.S.C. § 11, the intent of arbitrator['s] award and the *interests of justice* between the parties will best be *promoted* by ordering simply that the employee be awarded back pay for the 31-day period between his discharge and the date he pleaded guilty." (emphasis added)), *with* § 11 (providing in the last sentence that "[t]he order may modify and correct the award, so as to effect the intent thereof and *promote justice* between the parties" (emphasis added)). But even that proposition is irrelevant to the meaning of the plain terms of § 11(a) and, more specifically, whether those terms allow courts to look beyond the face of an award.

We must respectfully conclude, therefore, that *Valentine* misread *National Post Office*. It took *National Post Office*'s discussion of when vacatur under now-§ 10(a)(4) was appropriate and—without explanation or citation to on-point legal authority—grafted that discussion onto § 11(a). Therefore, *Valentine* is an unreliable guidepost for the interpretation of § 11(a), and we are unpersuaded by its holding. As a result, the Fifth Circuit's apparent rule—based on *Valentine*—that "an 'evident material [mis]calculation' occurs 'where *the record* that was before the arbitrator demonstrates an unambiguous and undisputed mistake of fact," *Prestige Ford*, 324 F.3d at 396 (quoting *Valentine*, 981 F.2d at

44

214), has no cogent force for us.  We endorse instead a face-of-the-award limitation.

* * *

To recapitulate, we hold that § 11(a) allows district courts to correct only those evident material miscalculations of figures that appear on the face of the arbitration award.  District courts may not look beyond the face of the award when determining whether such an error exists.  We derive that face-of-the-award limitation from the plain meaning of § 11(a) taken in context.  And persuasive out-of-circuit authority confirms our reading.

**B**

Having concluded that § 11(a) incorporates a face-of-the-award limitation, we now must determine whether the face of the arbitration award here contains an evident material miscalculation of figures.  It is Mid Atlantic's burden to prove that such a miscalculation appears on the face of the award.  *See Apex*, 142 F.3d at 194 (concluding that U.S. Supply "did not meet its burden under section eleven in order to modify the award"); *see also Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 603 (6th Cir. 2016) (explaining that the party seeking vacatur bears the burden); *Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 544 (5th Cir. 2016) (same).  Put simply, Mid Atlantic has not satisfied that burden.

45

The arbitration award ordered Mid Atlantic to pay Ms. Bien and Mr. Wellman two forms of damages: (1) initial-investment-loss damages and (2) compensatory damages. The award broke down as follows:

| Damages Award | Ms. Bien | Mr. Wellman | Both | Total |
|---|---|---|---|---|
| Initial Investment Loss | $240,321 | N/A | $52,090 | $292,411 |
| Compensatory Damages | $437,286 | $47,397 | N/A | $484,683 |
| Total | $677,607 | $47,397 | $52,090 | $777,094 |

Mid Atlantic argues that the award "included a clear 'double-counting.'"[10] Mid Atlantic's Opening Br. at 12. It posits that the $292,411 award for "initial investment loss" reflected the $292,411 in net out-of-pocket losses that Ms. Bien and Mr. Wellman's expert had testified that they suffered. Similarly, the $484,683 in "compensatory damages" almost exactly matched the $484,684 in "market-adjusted damages" that the expert had at one point said Ms. Bien and Mr. Wellman incurred. And, Mid Atlantic notes that the expert had testified, "market-

---

[10]    Ms. Bien and Mr. Wellman argue that Mid Atlantic failed to preserve its double-recovery argument by not raising the issue during arbitration. In particular, they fault Mid Atlantic for not invoking FINRA Rule 12905, which allows a party to alert the panel to computational errors in the award within ten days. *See* FINRA Code, Rule 12905(a)(2). Whether Mid Atlantic's failure to invoke that rule forfeited its double-recovery argument is an open question that we need not resolve here given that we conclude that Mid Atlantic's double-recovery argument fails in any event. *Cf. Murphy v. Royal*, 875 F.3d 896, 912 (10th Cir. 2017) (declining to resolve whether an issue was waivable or waived), *cert. granted*, 138 S. Ct. 2026 (2018); *United States v. Zander*, 794 F.3d 1220, 1233 (10th Cir. 2015) (same). We therefore assume without deciding that Mid Atlantic preserved its double-recovery argument.

adjusted damages include net out-of-pocket losses." *Id.* at 17. Indeed, the expert had presented net out-of-pocket damages and market-adjusted damages as alternative measures of the couple's losses. And Ms. Bien and Mr. Wellman had asked for only market-adjusted damages in their final prayer for relief. But the arbitration panel awarded Ms. Bien and Mr. Wellman what it labeled "initial investment losses" *and* "compensatory damages." In so doing, according to Mid Atlantic, the panel mistakenly awarded Ms. Bien and Mr. Wellman damages twice.

Even if we accept Mid Atlantic's double-counting argument, it does not carry the day on appeal. For example, let us say that Mid Atlantic is correct that the award included double counting. After all, it is conceivable that the arbitration panel misunderstood the alternative measures of damages that Ms. Bien and Mr. Wellman's expert had presented. And the panel may have inadvertently given them a double recovery by awarding them *both* measures of damages (i.e., net out-of-pocket losses *and* market-adjusted damages).

Mid Atlantic's double-counting argument, however, still would not permit it to prevail. Most obviously, the alleged material miscalculation did not appear on the face of the award. Further, the award did not even state that the "initial investment loss" damages corresponded to what the expert had called net out-of-pocket losses. Nor did the award say that the "compensatory damages" were

47

equivalent to the market-adjusted damages that the expert discussed. Critically, missing from the award was an explanation as to *how* the panel calculated the damages figures. We need not definitively opine on how much of such information would have been sufficient to make the alleged material miscalculation evident on the face of the award. Suffice it to say, the absence of all of this information under the circumstances here prevented the alleged material miscalculation from being evident on the face of the award. In short, "there is no math issue" on the face of the award. Ms. Bien & Mr. Wellman's Resp. & Principal Br. at 26. And Mid Atlantic does not suggest otherwise, arguing instead that courts are free to look beyond the face of the award. In the end, Mid Atlantic has not carried its burden of identifying an evident material miscalculation of figures that appears on the face of the award. Therefore, we are obliged to uphold the district court's decision not to rectify the alleged double recovery in favor of Ms. Bien and Mr. Wellman.

**IV**

With the issue Mid Atlantic raises in its appeal resolved, we turn now to the three questions that Ms. Bien and Mr. Wellman raise in their cross-appeal. Those questions ask whether the district court erred by (1) granting post-award interest on damages, but not attorney's fees and other costs; (2) awarding postjudgment interest at the federal rate; and (3) ordering Ms. Bien and Mr. Wellman to

48

reassign to Mid Atlantic any post-award distributions from their ownership interests in Sonoma Ridge Partners and KBS (including interest thereon).  We hold that the district court did not err in any of these respects.  Thus, we affirm the remainder of the amended final judgment.

## A

We start with the district court's first supposed error—granting post-award interest on damages, but not on attorney's fees and other costs.  As we explain, the district court did not err.

The arbitration award ordered Mid Atlantic to pay Ms. Bien and Mr. Wellman damages, attorney's fees, and arbitration costs.  As discussed above, the award ordered Mid Atlantic to pay two types of damages—"an initial investment loss" and "compensatory damages."  Aplt.'s App., Vol. I, at 28.  It also specified that Mid Atlantic was "liable for and shall pay . . . interest at the rate of 8% per annum beginning February 6, 2015[,] until" each type of damages was "paid in full."  *Id.*  However, in stating that Mid Atlantic was "liable for and shall pay" attorney's fees and costs, the award said nothing about interest.  *Id.*  By negative implication, the award seemed to effectively deny interest on the attorney's fees and costs.  *See* Scalia & Garner, *supra*, at 107–11.  The award made this more explicit by clarifying that "[a]ny and all claims for relief not specifically addressed herein . . . *are denied*."  Aplt.'s App., Vol. I, at 28 (emphasis added).

49

A "claim for relief" is "[a] demand for money, property, or a legal remedy to which one asserts a right." *Claim*, BLACK'S LAW DICTIONARY 311 (11th ed. 2019). As applicable here, the language "demand for money" in the definition of "claim" is naturally read as encompassing Ms. Bien and Mr. Wellman's request for interest on the attorney's fees and costs. *See* Aplt.'s App., Vol. I, at 27 (noting that Ms. Bien and Mr. Wellman sought any and all "relief which [the arbitration] Panel deem[ed] just and proper"). Yet, the arbitration panel's award did "not specifically address[]" this claim for relief (i.e., demand for money) of Ms. Bien and Mr. Wellman. *Id.* at 28. As a result, the arbitration award had the effect of not ordering Mid Atlantic to pay interest on attorney's fees or costs—only on the damages, which the award did address. Accordingly, the district court did not err in adhering to the award's terms by ordering Mid Atlantic to pay interest on only the damages.

Ms. Bien and Mr. Wellman, however, beg to differ. They contend that "the terms of [their] agreement" with Mid Atlantic compelled the district court to grant interest on the entire award—not just on the damages portion. Ms. Bien & Mr. Wellman's Reply Br. at 2. As they point out, the arbitration clause in the contracts with Mid Atlantic incorporated FINRA's arbitration rules. And FINRA Rule 12904(j) provides in relevant part:

> An award shall bear interest from the date of the award:

(1) If not paid within 30 days of receipt;

(2) If the award is the subject of a motion to vacate which is denied; or

(3) As specified by the panel in the award.

FINRA Code, Rule 12904(j). According to Ms. Bien and Mr. Wellman, the phrase "an *award* shall bear interest" means that interest accrues on "the entire award, and not simply parts of it." Ms. Bien & Mr. Wellman's Resp. & Principal Br. at 45. And, because their contracts with Mid Atlantic incorporated Rule 12904(j), they reason that "the explicit language" in their contracts compelled the district court to grant them interest on the entire award, not just on the damages. *Id.* at 47.

This argument fails. For starters, whether Rule 12904(j) requires interest to be paid on the entire award—i.e., on attorney's fees and costs as well as on damages—is a question of contract interpretation. Such questions are the province of the arbitration panel. After all, the parties bargained for "the arbitrator's construction" of their contract. *Burlington*, 636 F.3d at 570 (quoting *United Steelworkers*, 363 U.S. at 599); *see, e.g.*, Aplt.'s App., Vol. III, at 715 ("All controversies that may arise between you, [and] us . . . including, but not limited to, controversies concerning . . . breach of this or any other agreement between you and us . . . shall be determined by arbitration"). The only question for us is "whether the arbitrator (even arguably) interpreted the parties' contract,

not whether he got its meaning right or wrong." *Lovato*, 864 F.3d at 1083

(quoting *Oxford*, 569 U.S. at 569). In awarding interest on damages but not on

attorney's fees and costs, the arbitration panel here arguably interpreted the

contracts (including Rule 12904(j)) as not mandating that interest accrue on every

portion of the award. *Cf. Carpenters 46 N. Cal. Ctys. Conference Bd. v. Zcon

Builders*, 96 F.3d 410, 414 (9th Cir. 1996) ("[W]e hold that the district court

properly gave deference to the arbitrator's implicit decision on the notice issue.");

*McKesson Corp. v. Local 150 IBT*, 969 F.2d 831, 834 (9th Cir. 1992) (deferring to

arbitrator's implicit interpretation of contract); *E.I. DuPont de Nemours and Co.

v. Int'l Chem. Workers Union*, 968 F.2d 456, 458 (5th Cir. 1992) (remarking that

arbitrator's findings may be implicit). And we are bound by that interpretation

unless it is obviously contrary to "the plain language of the contract." *Lovato*,

864 F.3d at 1083 (quoting *Misco*, 484 U.S. at 38). It is not.

Rule 12904(j) speaks to *when* interest on an award begins accruing. But

the rule does not specify that the arbitration panel was required to award interest

on the entire award. Indeed, the plain terms of the rule at least arguably leave the

panel with the discretion to reach a contrary conclusion: that is, a panel may

expressly or effectively "specif[y] . . . in the award," FINRA Code, Rule

12904(j), that at no time will interest accrue on certain portions of the award.

Accordingly, because we cannot conclude that the arbitration panel's award here

52

is obviously contrary to the plain terms of the contracts insofar as it did not grant interest on attorney's fees or costs to Ms. Bien and Mr. Wellman, we must defer to that award.

In sum, the district court's decision that interest did not accrue on the attorney's fees and costs that the arbitration panel awarded to Ms. Bien and Mr. Wellman is consistent with the plain terms of the panel's award and those terms are not obviously contrary to the contracts of Ms. Bien and Mr. Wellman with Mid Atlantic. Accordingly, the district court did not err. We therefore affirm that portion of the amended final judgment.

**B**

We now consider the district's second supposed error—awarding postjudgment interest at the federal rate. Again, the district court did not err.

**1**

Federal law sets the rate at which postjudgment interest accrues on civil judgments in federal court. *See* 28 U.S.C. § 1961; *Youngs v. Am. Nutrition, Inc.*, 537 F.3d 1135, 1146 (10th Cir. 2008). Judgments confirming or modifying arbitration awards are not insulated by any exception from the operation of federal law. *See* 9 U.S.C. § 13 (giving such judgments "the same force and effect" as any other judgment and subjecting them to the same "provisions of law"). Indeed, once a district court confirms or modifies an arbitration award, the

53

cause of action underlying the award "merges into the judgment" and the federal rate set forth in 28 U.S.C. § 1961 applies. *In re Riebesell*, 586 F.3d 782, 794 (10th Cir. 2009); *see Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 457 (5th Cir. 2013); *Fid. Fed. Bank v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004); RESTATEMENT (SECOND) OF JUDGMENTS § 18 cmt. (a) (1982). That said, parties may contract around the merger rule and specify a different postjudgment interest rate. *See Newmont U.S.A., Ltd. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1276 (10th Cir. 2010). But to do so, they must express "their intent to override [28 U.S.C. § 1961] using 'clear, unambiguous and unequivocal language.'" *Id.* at 1277 (quoting *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 1004 (10th Cir. 2005)).

Outside the arbitration context, the parties' failure to clearly, unambiguously, and unequivocally express their intent to contract around the federal rate is dispositive. *See, e.g.*, *In re Riebesell*, 586 F.3d at 794–95. But in the arbitration context, there is another wrinkle to consider. Whether the parties intended to contract around the federal postjudgment interest rate "is a quintessential fact question." *Newmont*, 615 F.3d at 1277. So the parties may have agreed to have the arbitration panel decide whether they contracted around the federal postjudgment interest rate. *Id.* And if the arbitration panel concludes that the parties have done so, the panel may, "[c]onsistent with § 1961," order that the contracted-for rate apply. *Id.* In other words, if "the matter of post-

54

judgment interest was properly before the arbitration panel," *id.* at 1276, *and* the panel specifies that the contracted-for postjudment interest rate applies, we are bound by that finding, *id.* at 1277; *see Tricon*, 718 F.3d at 458 ("[I]nsofar as an arbitration panel sets a postjudgment rate as a matter of contract interpretation, its award is entitled to almost absolute deference."). But like parties, "arbitrators must be just as clear and unequivocal" in expressing their intent to stray from the federal postjudgment interest rate. *Id.* at 459; *see Durga Ma*, 387 F.3d at 1024 (holding that absent an express reference to postjudgment interest in the award the federal rate applies); *cf. Newmont*, 615 F.3d at 1276 (reversing imposition of federal rate when the arbitration panel had expressly awarded a different rate).

To recap, the federal postjudgment interest rate in 28 U.S.C. § 1961 applies unless one of two conditions is met. First, the federal rate does not apply if the parties clearly, unambiguously, and unequivocally contract for a different postjudgment interest rate. Second, if the parties put the postjudgment-interest issue before the arbitration panel *and* the panel similarly awards postjudgment interest clearly and unequivocally, then the awarded rate applies. Neither condition is met here.

**2**

**a**

Given our narrow review of arbitration awards, we begin with the second

55

condition. Insofar as there was a "controvers[y]" between the parties with respect to the rate of postjudgment interest, the parties contracted to place that dispute in the hands of the arbitration panel. *See, e.g.*, Aplt.'s App., Vol. III, at 715 ("All controversies that may arise between you, [and] us . . . including, but not limited to, controversies concerning . . . breach of this or any other agreement between you and us . . . shall be determined by arbitration"). The award here, however, never used the word "postjudgment." *See id.*, Vol. I, at 26–28. Indeed, in reciting the relief Ms. Bien and Mr. Wellman had requested, the award listed "[p]re-judgment interest" but not postjudgment interest. *Id.* at 27. The arbitration panel seemingly did not consider postjudgment interest. Perhaps for that reason, the award did "not specifically address[]" postjudgment interest. *Id.* at 28. As a result, the terms of the award dictate that the arbitration panel denied a claim for any specified rate of postjudgment interest, along with every other claim for relief "not specifically addressed" in the award. *Id.* Thus, even if "the matter of post-judgment interest was properly before the arbitration panel," *Newmont*, 615 F.3d at 1276, the panel did not award postjudgment interest at a rate other than that in 28 U.S.C. § 1961. Absent such an express award of postjudgment interest, the federal rate applies—just as the district court concluded.

**b**

Our examination of the parties' contracts ends with the same conclusion.

56

The word "postjudgment" appears nowhere in the contracts themselves *See* Aplt.'s App., Vol. III, at 705–37.  True, FINRA Rule 12904(j), which the contracts incorporate, provides:  "Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award was rendered, or at a rate set by the arbitrator(s)."  FINRA Code, Rule 12904(j).  But that rule is silent as to whether—or at what rate—*postjudgment* interest shall accrue.  And consistent with the merger rule, we have held that merely agreeing "to be bound by [a jurisdiction's] law does not amount to agreeing to a particular post-judgment interest rate."  *Reinhart*, 402 F.3d at 1004; *accord In re Riebesell*, 586 F.3d at 794; *see Tricon*, 718 F.3d at 459 (requiring parties to "expressly refer[] to postjudgment interest"); *Durga Ma*, 387 F.3d at 1024 (same).  Rule 12904(j) simply amounts to an agreement to be bound by a certain jurisdiction's law; that is insufficient to contract around the merger rule and the federal rate.  As a result, the parties did not clearly, unambiguously, and unequivocally contract around the federal postjudgment interest rate.

Ms. Bien and Mr. Wellman disagree.[11]  They point to FINRA Rule 12904(j) as evidence that they contracted with Mid Atlantic for the Colorado statutory postjudgment interest rate of 8%.  They reason that the arbitration panel "had the power to award [postjudgment] interest" at that rate—i.e., 8%.  Ms. Bien & Mr. Wellman's Resp. & Principal Br. at 50.  And according to Ms. Bien and Mr. Wellman, the arbitration panel exercised that authority by ordering that Mid Atlantic pay damages "plus interest at the rate of 8% per annum beginning February 6, 2015[,] *until . . . paid in full.*"  Aplt.'s App., Vol. I, at 28 (emphasis added).  Critical to their argument, Ms. Bien and Mr. Wellman read the "until paid in full" language as an award of both pre- and postjudgment interest at the rate of 8%.

This argument fails.  Its key misstep is in reading the "until paid in full" language as providing for an award of postjudment interest.  Court after court has

---

[11]      In their reply brief, Ms. Bien and Mr. Wellman offer additional arguments.  First, they contend that the district court erred in applying the federal rate because "the parties both agreed in their submissions to the District Court that the post-judgment interest rate was 8%."  Ms. Bien & Mr. Wellman's Reply Br. at 9–10 (emphasis omitted).  Second, they complain that "it simply makes no sense whatsoever to *modify* an arbitration award regarding interest simply because a judgment is now attached to the award."  *Id.* at 11.  Third, they rattle off some policy reasons why "[a]pplying a rate other than one stated by the arbitrators in their award" has "undesirable effect[s]."  *Id.* at 12.  We need not and do not consider these late-blooming arguments, however, since Ms. Bien and Mr. Wellman waited until their reply brief to raise them.  *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]rguments raised for the first time in a reply brief are generally deemed waived.").

rejected this argument. Take *Tricon* as an example. As here, the arbitration award imposed interest "until paid." 718 F.3d at 459. "[T]hough, interpreted literally," that language would apply "beyond the judgment," the Fifth Circuit held that the award spoke only to prejudgment interest. *See id.* at 459–60. "Such boilerplate language," the court explained, could not "circumvent the merger rule" and deviate from the federal postjudgment interest rate. *Id.* at 460. The Second, Ninth, and Eleventh Circuits have reached similar or analogous conclusions in the arbitration context. *See Carte Blanche Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 264, 270 (2d Cir. 1989) (holding the federal rate applied despite award of interest "to the date of payment"); *Parsons & Whittemore Ala. Mach. & Servs. Corp. v. Yeargin Const. Co.*, 744 F.2d 1482, 1483–84 (11th Cir. 1984) (holding that the federal rate applied despite award of interest "until the award was paid"); *cf. Durga Ma*, 387 F.3d at 1024 (holding award of "interest at the statutory rate" did not circumvent the federal rate).

Outside of the arbitration context, our court has likewise held that a contract using the language "shall accrue interest until payment" was not a "contract for a post-judgment interest rate," meaning "the federal rate applie[d]." *In re Riebesell*, 586 F.3d at 794–95. Given this contrary authority, Ms. Bien and Mr. Wellman's reliance on the "until paid in full" language is misplaced.[12]

_____

[12]     To support their until-paid-in-full argument, Ms. Bien and Mr.

(continued...)

59

In summary, even if the postjudgment-interest issue were properly before the arbitration panel, we would not read the panel's award as clearly and unequivocally awarding postjudgment interest. Nor did the parties clearly, unambiguously, or unequivocally express their intent to contract around the federal rate. The district court was therefore correct to apply the federal postjudgment interest rate.

## C

We now consider whether the district court erred by ordering Ms. Bien and Mr. Wellman to reassign to Mid Atlantic any post-award distributions from their ownership interests in Sonoma Ridge Partners and KBS (including interest thereon). We conclude that Ms. Bien and Mr. Wellman have not demonstrated that the district court erred.

The arbitration award ordered Ms. Bien and Mr. Wellman to "reassign ownership of all Sonoma Ridge Partners and KBS REIT investments to [Mid

---

[12](...continued)
Wellman cite only two district court cases. The first case ordered that post-award interest would continue "until payment." *Kruse v. Sands Bros. & Co.*, 226 F. Supp. 2d 484, 489 (S.D.N.Y. 2002). But it said nothing about postjudgment interest. *See id.* The second case applied the rules of FINRA's predecessor (i.e., NASD) to award postjudgment interest at a state-law rate because the arbitration award was silent on that issue *and* the opposing party had failed to timely offer any arguments to the contrary. *See McClelland v. Azrilyan*, 31 F. Supp. 2d 707, 713 (W.D. Mo.), *aff'd*, 168 F.3d 494 (8th Cir. 1998). Our synopses of these cases should be enough to reveal their weaknesses. Suffice it to say, neither is persuasive.

Atlantic]." Aplt.'s App., Vol. I, at 28. Mid Atlantic was served with the award in December 2016. After this service, Ms. Bien and Mr. Wellman say that they contacted Mid Atlantic about reassigning the investments. According to the couple, Mid Atlantic thought reassigning the investments was "premature" because it had moved to vacate the award. Ms. Bien & Mr. Wellman's Resp. & Principal Br. at 52 n.18. Consequently, Ms. Bien and Mr. Wellman retained ownership of the investments during the district court proceedings.

Having confirmed the arbitration panel's award, in its amended final judgment entered in April 2018, the district court ordered Ms. Bien and Mr. Wellman to "reassign ownership of all Sonoma Ridge Partners and KBS REIT investments to . . . Mid Atlantic." Aplt.'s App., Vol. V, at 1093. However, the court specifically clarified that "the reassignment shall include any and all amounts distributed to [Ms. Bien and Mr. Wellman] by the Sonoma Ridge Partners and KBS REIT investments after the [arbitration] Award, as well as any interest earned on such distributions." *Id.*

Ms. Bien and Mr. Wellman now argue that the district court erred in ordering them to reassign to Mid Atlantic any post-award distributions from their ownership interests in Sonoma Ridge Partners and KBS. They argue that the district court strayed from "[t]he plain language of the [arbitration] Award." Ms. Bien & Mr. Wellman's Resp. & Principal Br. at 52. That award "did *not* require"

them to pay Mid Atlantic the post-award distributions from the investments. *Id.* Had the arbitration panel meant to do so, they argue it "could have stated so in the Award." *Id.* But the panel did not, and instead ordered that Ms. Bien and Mr. Wellman assign only "their 'ownership' in the [Sonoma Ridge Partners and KBS investments]." *Id.* Hence, Ms. Bien and Mr. Wellman contend that the district court erred by improperly modifying the award to require them to reassign the post-award distributions.

This argument is unpersuasive. Notably, Ms. Bien and Mr. Wellman cite to no on-point legal authority to support this contention of error. This failing in itself inclines us to reject their challenge. *See, e.g.*, *Grissom v. Roberts*, 902 F.3d 1162, 1173 (10th Cir. 2018) ("It is a party's duty to develop an argument if it wishes a determination by this court."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . .").

Moreover, Ms. Bien and Mr. Wellman do not meaningfully dispute Mid Atlantic's factual assertions concerning the status of their investments at the time the district court ruled. Specifically, Mid Atlantic underscores in its briefing that "investments are not static" and that Ms. Bien and Mr. Wellman "were paid cash distributions on those investments post-Award . . . . [and] both investments were *liquidated* and have no value at all" after the arbitration award, except for a

62

substantial distribution that Ms. Bien and Mr. Wellman received for their ownership interests in KBS. Mid Atlantic's Resp. & Reply Brief at 39 (emphasis added). In response, Ms. Bien and Mr. Wellman do no more than make one vague assertion—without citation to the record—that Mid Atlantic "has completely reversed course on its valuation of Sonoma Ridge" from the position it took "[a]t the arbitration" by now asserting, "in an almost ironic twist," that after the arbitration award their interests in the Sonoma Ridge Partners investment became worthless. Ms. Bien & Mr. Wellman's Reply Br. at 14. Further, addressing our questions at oral argument, counsel for Ms. Bien and Mr. Wellman acknowledged that there had been a "liquidating distribution" and that there was nothing left of the stocks themselves. Oral Arg. at 29:56–30:06; *see id.* at 30:32–37.

This failure to meaningfully dispute Mid Atlantic's factual assertions is significant. Part and parcel of Ms. Bien and Mr. Wellman's overarching obligation to explain how the district court erred is the obligation to give us an accurate picture of the factual landscape before the district court when it ruled. *Cf. Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) ("The first task of an appellant is to explain to us why the district court's decision was wrong."). Consequently, because Ms. Bien and Mr. Wellman have not meaningfully challenged—and indeed seem to agree with—Mid Atlantic's

63

assertions concerning the status of their investments at the time the district court ruled, we proceed on the premise that Mid Atlantic's assertions are correct.

With this understanding of the factual landscape, and without the benefit of citations of apposite authority from Ms. Bien and Mr. Wellman, we find their last contention of error unpersuasive. Ms. Bien and Mr. Wellman's argument begs the important question—what does "ownership" of the investments mean? The investments were "common stock" in KBS and Sonoma Ridge Partners. Aplt.'s App., Vol. IV, at 885–87 (Proposed Assignment of Stock, dated June 12, 2017). The ordinary legal understanding of "common stock" is "[a] class of stock entitling the holder . . . to receive dividends . . . and to share in assets upon liquidation." *Common Stock*, BLACK'S LAW DICTIONARY, *supra*, at 1713; *see, e.g.*, 18 C.J.S. *Corporations* § 215, Westlaw (database updated Mar. 2020) (noting that "[a] common stockholder is an owner of the enterprise in proportion that his or her stock bears to the entire stock and ordinarily he or she is entitled to . . . ultimate distribution of assets of the corporation").

"Ownership" of the investments, then, entailed the right to receive distributions and to share in the liquidated assets. Thus, the arbitration award that ordered Ms. Bien and Mr. Wellman in December 2016 to reassign ownership of their investments in Sonoma Ridge Partners and KBS to Mid Atlantic also should be read as having effectively ordered them to reassign to Mid Atlantic (in addition

to any actual common stock) their rights to future distributions from those investments. And it is undisputed that—irrespective of the reason—Ms. Bien and Mr. Wellman did not act on the arbitration panel's order: that is, they did not reassign their ownership interests in the Sonoma Ridge Partners and KBS investments to Mid Atlantic before the district court entered its amended final judgment in April 2018. It is further uncontested that at the time the court entered its amended final judgment, essentially all that was left of the ownership interests of Ms. Bien and Mr. Wellman in Sonoma Ridge Partners and KBS *was* their distributions following liquidation.

Therefore, when the district court ordered Ms. Bien and Mr. Wellman to reassign their distributions from Sonoma Ridge Partners and KBS (as well as interest thereon) to Mid Atlantic, it was actually enforcing the terms of the arbitration award—which required reassignment of their ownership interests in those investment vehicles—instead of straying from those terms. Stated otherwise, when the district court entered its amended final judgment in April 2018, it ensured that Mid Atlantic received *all* of the ownership interests—which included the right to future distributions—that Ms. Bien and Mr. Wellman had in their Sonoma Ridge Partners and KBS common stock, just as the arbitration panel contemplated. Accordingly, we reject the last contention of error of Ms. Bien and Mr. Wellman.

## V

For the reasons stated above, we **AFFIRM** the amended final judgment in all respects.[13]

---

[13]    Having carefully considered the merits of Mid Atlantic's pending unopposed motion to file Volume VI of the appendix under seal in light of the public's "right of access to judicial records," *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135 (10th Cir. 2011), we **grant** the motion.